Donald PENNINGTON, et al. *v.* HARVEST FOODS, INC.

95-732                                              934 S.W.2d 485

Supreme Court of Arkansas
Opinion delivered November 25, 1996
[Petition for rehearing denied January 13, 1997.*]

---

* Glaze, J., would grant.

*Dodds, Kidd, Ryan & Moore*, by: *Charles Gregory Alagood*, for appellants Joel Tumblson, Sr., and Soundra Tumblson.

*David H. Williams*, for appellants Joel Tumblson, Jr., T.S.P., Inc., and Top Spread Potato, Inc.

*Wilson, Engstrom, Corum & Coulter*, by: *Stephen Engstrom, Gary D. Corum*, and *Nate Coulter*, for appellee Harvest Foods, Inc.

ROBERT L. BROWN, Justice. This is an appeal by appellants Joel Tumblson, Sr.; Soundra Tumblson; Joel Tumblson, Jr.; T.S.P., Inc.; and Top Spread Potato, Inc. (Tumblson appellants). The appellee is Harvest Foods, Inc., a corporation that owned over 50 grocery stores at time of trial. On May 16, 1994, Harvest Foods filed its second amended complaint against Don Pennington (former President and CEO of Harvest Foods), the Tumblson appellants, John Oldner and his various businesses, and Billy J. Armstrong and Service Brokerage Company, Inc. In that complaint, Harvest Foods outlined three schemes devised by the defendants that supported causes of action for breach of fiduciary duty, civil conspiracy, conversion, and fraudulent concealment.

The first conspiracy alleged was between Pennington and John Oldner (Oldner/Pennington conspiracy). The facts asserted were that Oldner, a food broker, acquired various products such as health and beauty aids and bagged ice for resale to retail chains like Harvest Foods. Pennington allegedly received kickbacks in the form of commissions from Oldner on products sold to Harvest Foods through Oldner's businesses. Pennington and Oldner also conspired to steer business to Oldner's clients. Oldner in turn would pay Pennington a "consulting fee" through an account known as Capital City Marketing, which was maintained by Pennington. The conspiracy occurred in 1990 and 1991.

The second alleged conspiracy was between Pennington and Billy J. Armstrong, also a food broker (Armstrong–Pennington conspiracy), and it, too, was a kickback scheme. Armstrong owned in whole or in part Service Brokerage Company, Inc. Pennington sent business to Armstrong through Service Brokerage Company, and the two men split the brokerage fees, commissions, and "slotting fees" paid by manufacturers for space in the chain's warehouse. Pennington was also paid by Armstrong as a "consultant." Payments

were made to Pennington's Capital City Marketing account set up by Pennington. Coleman Dairy, Bunzl Mac-Pac, Sweetheart Cups, and other vendors were alleged to be involved through Armstrong. The conspiracy occurred from 1989 into 1991.

The third alleged conspiracy involved Pennington and the Tumblson appellants (Tumblson/Pennington conspiracy) and was a self-dealing scheme. Joel Tumblson, Sr., was the produce merchandising manager at Harvest Foods and in that capacity bought produce for the store. He worked under Pennington, and the two men started a company known as T.S.P. in 1987, which bought produce, packaged it, and sold it to Harvest Foods. Soundra Tumblson worked for T.S.P. as bookkeeper and eventually owned half the stock of the company. Betty Bryant, Pennington's former spouse, owned the other half of the company's stock. Joel Tumblson, Jr., managed the day-to-day operations of T.S.P.[1] T.S.P. sold potatoes, tomatoes, onions, watermelons, and other produce to Harvest Foods at inflated prices, with Joel Tumblson, Sr., controlling both ends of the transaction. Joel Tumblson, Sr., and Pennington divided the profits derived at T.S.P. The arrangement continued into 1991.

On June 30, 1993, T.S.P. and Joel Tumblson, Jr., moved to sever the claims against them from the claims involving the Oldner/Pennington conspiracy and the Armstrong/Pennington conspiracy. Two days later, Joel Tumblson, Sr., and Soundra Tumblson filed their motion to sever on the same basis. A hearing on the motions was held on August 2, 1993. At the hearing, the Tumblson appellants argued that Pennington was the only link among the defendants and the three conspiracies and that the Tumblson/Pennington conspiracy should be severed. In denying the motions to sever, the court said:

> There are doubts in my mind that this would not be proper to sever, but if the plaintiff feels comfortable in proceeding without the severance and feels strongly enough that this is not reversible error, I'm not going to sever. I think that the Supreme Court might well agree with you defendants that is (sic) should be severed but it's the plaintiff's lawsuit.

---

[1] The corporate name was changed to Top Spread Potato, Inc., in 1989. The company's operation moved to Oklahoma City, Oklahoma in 1990. The reference in this opinion for both operations will be T.S.P.

The order denying severance was entered on December 1, 1993.

The three-and-one-half-week trial began on September 13, 1994. Before the testimony, counsel for T.S.P. and Joel Tumblson, Jr., objected to Harvest Foods "changing horses" at trial on their theory of damages because the company had not previously stated it was going to pursue the benefits received by the Tumblsons and Pennington as a damage theory in addition to lost profits to the company. Counsel for Harvest Foods denied the allegation and argued that the damages were not inconsistent. Counsel for Joel Tumblson, Sr., and Soundra Tumblson added that the new damage theory smacked of restitution and claimed that Harvest Foods did not disclose this theory when questioned during discovery. The trial court denied a motion for continuance and ruled that the defendants were not surprised by the evidence and further that the damages for benefits received were part and parcel of the overall damages claimed by Harvest Foods.

Because of the issues raised at trial and on appeal, we will present an abstract of the testimony at trial. Robert Rough, who had previously worked for Harvest Foods as Chief Financial Officer, testified that he was the second highest ranking officer at the company. Rough stated that after Pennington left the company, he collected the financial records involving Pennington's transactions. He found three schemes involving Oldner and Pennington. One involved consulting fees and brokerage commissions for health and beauty products purchased from SAJ Distributors and bagged ice purchased from Big-R Ice Company. The fees and commissions were split between the men.

Rough also described three schemes under the Armstrong/Pennington conspiracy. Coleman Dairy had been a supplier of dairy products to Harvest Foods without the need for a food broker. Rough testified that Armstrong's firm, Service Brokerage, began acting as a food broker for the account and that funds were traced from Harvest Foods to Service Brokerage and then to Pennington's Capital City Marketing account. Rough explained that Armstrong claimed that the money paid to Pennington's account was for consulting services by Pennington. The second scheme involved Bunzl Mac-Pac, a distributor of foam trays for meat and plastic bags for produce. As in the case of Coleman Dairy, Harvest Foods was already getting its foam trays from another company without the need for a food broker. Thereafter, the original supplier of foam

trays wanted to include Bunzl Mac-Pac in the distribution scenario. At first, the price of the trays did not change. Rough testified that it was later discovered that the price of the foam trays had increased exactly six percent and that funds were routed to Armstrong's firm and Pennington's Capital City Marketing account in connection with brokerage payments for the foam trays. For the final scheme, Rough testified that Harvest Foods did not receive slotting fees for space in Harvest Foods's warehouse for a line of new products from Sweetheart Cup as it should have. The payment was made directly to Service Brokerage.

Rough next testified that Don and Betty Pennington and Joel and Soundra Tumblson were the owners of T.S.P. He stated that he figured the total benefit to the Penningtons under the potato scheme from 1988 to 1991 was $311,761. The benefit to Joel and Soundra Tumblson for the same period was $336,047. Joel Tumblson, Sr., received his salary from Harvest Foods in addition to that. Rough believed that the company was entitled to recover the salaries paid to all three Tumblsons. His total figure for benefits received by the Tumblson/Pennington conspirators over the term of the conspiracy was in excess of $1,300,000.

Rough further testified that Harvest Foods was damaged by paying inflated prices to T.S.P. He concluded that T.S.P. owed all of its profits to Harvest Foods. T.S.P.'s sales to Harvest Foods from 1987 to 1991 were $14.3 million or 16% to 18% of Harvest Foods's total produce purchases. Rough admitted that there were no documents to tie Armstrong into the T.S.P. or Oldner schemes.

Brad Moore testified that he worked for Bunzl Mac-Pac, which supplied foam trays to the meat department at Harvest Foods. Bunzl used Armstrong's company, Service Brokerage, as a food broker, and Armstrong approached Moore about paying Armstrong a direct commission. Moore initially declined because he would have to raise the price of his product to include the commission in order to maintain profit margin. After a business lunch with Armstrong, Pennington, and Bill Mathis, who was in charge of the meat department, Moore agreed to raise the price of the foam trays and further agreed that the arrangement would go through Armstrong's brokerage firm. By letter, Armstrong instructed Brad Moore to make the additional payments to Pennington's Capital City Marketing account.

Douglas Johnson worked for Sweetheart Cup Company. He testified that Harvest Foods was to be paid $22,800 as a slotting fee by his company. The money was paid into Armstrong's account for Service Brokerage, but Johnson later concluded that Harvest Foods never received that money. At the conclusion of Johnson's testimony, counsel for T.S.P. and Joel Tumblson, Jr., renewed a continuing objection to the testimony of the last few witnesses as irrelevant and prejudicial to their clients. They moved for a curative instruction, but the court denied the motion.

Roy Kipp, at time of trial an executive vice-president of Harvest Foods, testified that he took over the produce department previously managed by Joel Tumblson, Sr. He knew that Tumblson had an ownership interest in T.S.P., and he instructed his buyer to stop buying from T.S.P. He also implemented a new competitive bidding system for suppliers that had not previously been required. He testified that the potatoes received after the relationship with T.S.P. was terminated were fresher and a better quality. He testified that gross profit increased by 10% after he instituted competition and made the change from T.S.P. He estimated that the company had overpaid T.S.P. for potatoes by about $413,955.

By way of deposition, Soundra Tumblson testified that she owned 50% of the stock of T.S.P. and that Betty Pennington owned the remaining 50%. She stated that Betty Pennington was also on the board of directors but never attended a meeting. Joel Tumblson, Sr., testified in his deposition that he had worked for Safeway and then Harvest Foods since 1964. He stated that only his wife had an ownership interest in T.S.P. He testified that he decided who would run T.S.P. and how much they would be paid. He added that Joel Tumblson, Jr., paid him some cash from the sale of watermelons, and he split the money with Pennington. He did this up to twelve times, he stated, and never counted the money. He denied that T.S.P. ever sold anything to Harvest Foods but believed that T.S.P. sold to food brokers who may have sold to Harvest foods.

Joel Tumblson, Jr., testified that he made $40,000 per year working for T.S.P. He started working for T.S.P. in 1987 as a forklift operator and eventually took over the operation in Little Rock. He described T.S.P. as a "potato shed" where potatoes were graded and packaged for resale as well as onions, tomatoes, watermelons, and other produce. Harvest Foods was T.S.P.'s largest customer with at least 50% to 75% of its sales being made to Harvest Foods. He

added that he never knew who the shareholders and directors of T.S.P. were. He did not see anything wrong with T.S.P.'s selling produce to Harvest Foods even though his father ran the produce department there. He admitted that T.S.P.'s other customers were probably getting a cheaper potato than Harvest Foods.

Dr. Charles Venus, an economist and expert witness for Harvest Foods, testified about lost profits to Harvest Foods. The Tumblson appellants again objected to his testimony as prejudicial because he propounded two theories of damage recovery — benefits received by the conspirators and lost profits to Harvest Foods — but the trial court overruled the objection. Venus testified that T.S.P. sold 94 different products to Harvest Foods. After going through the figures and his calculations, he concluded that there was a 5.14% change in gross profits to Harvest Foods for the period when T.S.P. was selling produce to Harvest Foods compared to the period when it was not, which translated into a loss to Harvest Foods of $1,545,063 per year over the three and three-quarters years of T.S.P.'s business relationship. He estimated T.S.P.'s markup at 28% and placed the total lost profits to Harvest Foods at $5,700,000. Venus testified that his estimate of $1.5 million in damages per year was a minimum when compared to Roy Kipp's estimate of a $2.5 million loss per year.

Harvest Foods then introduced the deposition of Don Pennington. Pennington testified that his salary from Harvest Foods was $165,000 per year. He denied having income from any other source but stated that his wife received $83,000 annually from T.S.P. as a director and that he deposited those fees into their joint checking account. He testified that he had worked as a consultant for Armstrong and Oldner. In 1990, he received income for his various consulting services with them in the neighborhood of $186,892.26. That year, he withdrew $184,700 from the Capital City Marketing account for those services. He testified that he was a passive investor in T.S.P. According to Pennington, the board of directors of Harvest Foods was aware of his relationship with T.S.P. He testified that Joel Tumblson, Sr., would pay him $2,000 to $3,000 periodically — sometimes twice a month. He added that even though his wife was a director of T.S.P., she was never involved in the business. Joel Tumblson, Sr., according to Pennington, talked him into starting T.S.P., and there was no initial investment required. Pennington denied knowing that T.S.P. did direct business with Harvest Foods

but believed instead that T.S.P. used a food broker as an intermediary.

Betty Bryant, Pennington's ex-wife, testified that her divorce became final in October of 1991. She testified that in 1987, Pennington stopped allowing her to write checks and gave her cash when she needed it because he did not want anyone knowing his business. She did not know about her involvement with T.S.P. until Pennington received a payment from the company in an envelope bearing her initials, which she found in the trash. She also found a check made payable to her for director's fees in the amount of $16,750, but she never received the money. She later learned that she had been listed as an officer and director of T.S.P. She testified that Pennington told her that he bought a car for Joel Tumblson, Sr., because he had made him over $800,000 the previous year.

After Harvest Foods rested, counsel for Joel Tumblson, Sr., moved for a directed verdict and argued to the trial court that his client did not owe a fiduciary duty to Harvest Foods because he was only a managerial employee of the company. He also moved for a directed verdict because there was insufficient evidence that Soundra Tumblson aided and abetted her husband in a breach of fiduciary duty. The trial court denied the motions. The Tumblson appellants then moved for a mistrial based on the failure to sever the Tumblson/Pennington case from the other two conspiracies. The trial court expressed concern over the motions for mistrial but denied them. The trial court did, however, reject joint and several liability for all defendants and limited joint and several liability to the participants in each of the three conspiracies.

Liles Henry, a CPA with a masters degree in statistics, testified in the case-in-chief of the Tumblson appellants. Henry criticized Dr. Venus's calculations. He testified that the benefit received by Pennington for the T.S.P. arrangement over the period in question was $276,750, and the benefit received by Joel and Soundra Tumblson was $265,878. He saw no benefit to Joel Tumblson, Jr., because he was merely a salaried employee of T.S.P. After several more witnesses testified, the Tumblson appellants rested and generally renewed their motions, including their motion for a mistrial which had been couched in terms of severance. They were denied. There were two rebuttal witnesses by Harvest Foods. Additional motions were not made following their testimony.

During the arguments over the instructions, counsel for Joel Tumblson, Jr., and T.S.P. objected to the damage instruction because the testimony about lost profits to Harvest Foods was speculative and there was no showing of proximate causation relating to lost profits. Counsel for Joel Tumblson, Sr., and Soundra Tumblson complained that the instruction was improper because it entailed two conflicting theories of damage — benefits received and lost profits to the company — which required an election of remedies.

Counsel for Harvest Foods responded that this issue had been decided before trial and by the denial of motions for directed verdict. Counsel for Pennington objected to the language of the damage instruction and proffered his own instruction that would only allow damages for benefits received by the alleged conspirators. The jury was instructed to consider the three conspiracies separately.

The jury rendered its judgment in the form of interrogatories. The jury specifically found that (1) Pennington breached his fiduciary duty in connection with the Oldner transactions; (2) Pennington committed fraud by his nondisclosure of the Oldner transactions; (3) Pennington breached his fiduciary duty for transactions involving T.S.P. and Top Spread; (4) Pennington committed fraud in connection with the T.S.P. and Top Spread transactions; (5) Joel Tumblson, Sr., owed and breached his fiduciary duty to Harvest Foods; (6) Pennington breached his fiduciary duty in regard to the Armstrong transactions with Coleman Dairy, Bunzl, and Sweetheart Cup; (7) Pennington committed fraud for his nondisclosure of the Armstrong transactions; (8) Oldner and his companies aided and abetted Pennington in the breach of his fiduciary duty; (9) Oldner and his companies conspired with Pennington in the breach of his fiduciary duty; (10) the Tumblson appellants aided and abetted Pennington or Joel Tumblson, Sr., in the breach of his fiduciary duty; (11) Joel Tumblson, Sr., conspired with Pennington and that Soundra Tumblson and Joel Tumblson, Jr., conspired with Joel Tumblson, Sr., and/or Pennington in the breach of their fiduciary duties; (12) and (13) Armstrong aided and abetted Pennington and conspired with him in the breach of his fiduciary duties in the Coleman Dairy, Bunzl, and Sweetheart Cup deals.

The jury found that Harvest Foods was damaged in the amount of $2,000,000 by the Oldner transactions, $3,250,000 by the T.S.P. transactions, and $115,121.72 by the Armstrong transac-

tions. In the judgment, Pennington, Oldner, and the Oldner Companies were assessed damages, jointly and severally, in the amount of $769,805.91[2] for fraud and breach of fiduciary duty. Pennington was adjudged liable for the additional $1,165,194.09 attributed to the Oldner/Pennington conspiracy. Pennington, Tumblson, Sr., Tumblson, Jr., Soundra Tumblson, T.S.P., and Top Spread were held jointly and severally liable for $3,250,000. Pennington, Armstrong, and Service Brokerage, Inc. were found to be jointly and severally liable for $102,621.72. The jury further awarded $1,000,000 in punitive damages against Pennington and $500,000 in punitive damages against Joel Tumblson, Sr.

On November 8, 1994, T.S.P. and Joel Tumblson, Jr., moved for a new trial or, alternatively, for remittitur. They alleged that the trial court abused its discretion in refusing to grant severance and that this resulted in an award of excessive damages against them on insufficient evidence. They also contended that Harvest Foods was erroneously permitted to submit two theories of recovery to the jury that resulted in a double recovery.

On that same date, Joel Tumblson, Sr., and Soundra Tumblson moved for a new trial. They, too, complained that the trial court erred in failing to sever the cases because prejudicial testimony impacted their case. The Tumblsons also claimed that they should have been granted a continuance when they learned of Harvest Foods's attempt to recover under two conflicting damage theories. Finally, they complained that the damages were not supported by the evidence.

The trial court denied the post-trial motions without discussion.

The Tumblson appellants now claim on appeal (1) Harvest Foods received a double recovery, (2) proof of damages was insufficient, (3) denial of a continuance was an abuse of discretion, (4) the trial court erred in denying severance of the trials, and (5) Joel Tumblson, Sr., owed no fiduciary duty to Harvest Foods. We agree that the Tumblson/Pennington conspiracy should have been tried separately from the Oldner/Pennington and Armstrong/Pen-

---

[2] Oldner was given a credit in the amount of $65,000 for a settlement reached between Scott McPherson, a former employee, and Harvest Foods in connection to the Oldner transactions. The jury had originally assessed $834,805.91.

nington conspiracies. We further find no basis in the record for the $3,250,000 damage award against the Tumblson appellants which lends credence to their contention of confusion on the part of the jury in making the award. We reverse the judgment against the Tumblson appellants and remand for a new trial.[3]

## I. Severance

The Tumblson appellants contend that they were prejudiced by a joint trial which involved two unrelated conspiracies: the Oldner/Pennington conspiracy and the Armstrong/Pennington conspiracy. Though counsel for Harvest Foods made representations before trial that these two conspiracies were intertwined with the Tumblson/Pennington conspiracy, there was no proof at trial to evidence that the conspiracies were interrelated. As Harvest Foods admits, the Tumblson appellants repeatedly moved for severance throughout the trial and again did so in their motions for a new trial.

██ The relevant rules are Rule 20 and Rule 42 of the Arkansas Rules of Civil Procedure. The apposite part of Rule 20 on permissive joinder of parties reads:

> (a) Permissive Joinder. ... All persons may be joined in one action as defendants if there is asserted against them jointly, severally, or in the alternative, any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all defendants will arise in the action. ...

> (b) Separate Trials. The court may make such orders as will prevent a party from being embarrassed, delayed, or put to expense by the inclusion of a party against whom he asserts no claim and who asserts no claim against him and may order separate trials or make other orders to prevent delay or prejudice.

Rule 42 reads:

---

[3] Appeals by Pennington, Armstrong, and Service Brokerage, Inc, were dismissed for failure to file the transcript in a timely manner. *Pennington v. Harvest Foods, Inc.*, 322 Ark. 820, 913 S.W.2d 758 (1995) (per curiam). The appeal of Oldner and his businesses has been stayed. *Pennington v. Harvest Foods, Inc.*, 326 Ark. 272, 929 S.W.2d 162 (1996).

(a) Consolidation. When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delays.

(b) Separate Trials. The court, in furtherance of convenience or to avoid prejudice, or when separate trial will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim, counterclaim, or third-party claim, or of any separate issue or any number of claims, cross-claims, counterclaims, third-party claims, or issues.

A trial court's order pursuant to Rule 42 is a matter within the trial court's discretion, and the court's decision will not be reversed absent a showing of abuse of that discretion. *Ciba-Geigy Corp.* v. *Alter*, 309 Ark. 426, 834 S.W.2d 136 (1992); *Missouri Pac. R.R. Co.* v. *Arkansas Sheriff's Boy's Ranch*, 280 Ark. 53, 655 S.W.2d 389 (1983).

█ The primary purpose of the rule is to advance judicial economy so long as the parties are not prejudiced. *See Ciba-Geigy Corp.* v. *Alter, supra.* The trial court's abuse of discretion in denying severance can be demonstrated by a showing of prejudice to the complaining party. *Id.*

The conspiracy theory advanced by Harvest Foods for joinder of party defendants is a wheel-conspiracy theory in which Don Pennington sat at the hub of the wheel and the Oldner/Pennington conspiracy, Armstrong/Pennington conspiracy, and Tumblson/Pennington conspiracy were separate spokes of the wheel. In 1983, the Eighth Circuit Court of Appeals affirmed a summary judgment in an antitrust case in favor of corporate defendants and the Department of Agriculture extension veterinarian, in part, on the basis that the evidence of the antitrust violation did not support a finding of a hub-and-spoke conspiracy. *Impro Products, Inc.* v. *Herrick*, 715 F.2d 1267 (8th Cir. 1983). The Court of Appeals stated:

Second, the record shows that none of the corporate defendants communicated with any of the others concerning Impro or its products until after the plaintiff commenced this lawsuit, and that none of the corporate defendants knew that Herrick had consulting agreements with any of the other

corporate defendants. This evidence — combined with the district court's findings that none of the corporate defendants had entered into an agreement with Dr. Herrick to disparage Impro — precludes this Court from concluding, as required by the *Elder-Beerman* test [*Elder-Beerman Stores Corp.* v. *Federated Dep't Stores, Inc.*, 459 F.2d 138 (6th Cir. 1972)], that there existed an overall plan to suppress the plaintiff as a competitor or that each defendant had knowledge that others were involved in the conspiracy.

*Id.* at 1280.

Three cases are instructive on the wheel conspiracy. *Corrigan* v. *Methodist Hospital*, 160 F.R.D. 55 (E.D. Pa. 1995); *S.E.C.* v. *Peters*, 735 F. Supp. 1505 (D. Kan. 1990), *rev'd on other grounds*, 978 F.2d 1162 (10th Cir. 1992); *Tri-R Systems, Ltd.* v. *Friedman & Son, Inc.*, 94 F.R.D. 726 (D. Colo. 1982). In each of these cases, a motion for separate trial was made and in each case the motion was denied.

■ In *Corrigan* v. *Methodist Hospital, supra,* the medical physician sought severance of the negligence and informed-consent claims against him from those against the hospital for negligent credentialling. The district court noted that separate trials were ordered only when necessary. Citing *Tri-R Systems, Ltd.* v. *Friedman & Son, Inc., supra,* the court set out the three factors to weigh in deciding to order separate trials for separate defendants:

These are 1) whether separate trials would further the convenience of the parties; 2) whether separate trials would promote judicial economy; and 3) whether separate trials would avoid substantial prejudice to the parties. *Tri-R Sys.* v. *Friedman & Son*, 94 F.R.D. 726, 727 (D.Colo. 1982).

*Corrigan,* 160 F.R.D. at 57. The mere possibility of some prejudice is not enough, the district court concluded, where prejudice is not substantial and where there are strong countervailing considerations of judicial economy. *Id.*

The district court then noted the "spillover" effect that can occur when the evidence of specific injuries suffered by the plaintiff might influence the jury's consideration of other issues. According to the district court, steps to remedy prejudice might involve protective measures like cautionary warnings, limiting instructions, and other instructions to the jury. The court concluded, however, that

the physician had presented no evidence that the proof and witnesses in each issue were different and easily separable. That is not the situation in the case before us.

Our court has considered the detrimental impact of combined trials under certain circumstances. In *Ciba-Geigy Corp.* v. *Alter, supra,* we held that the trial court abused its discretion in refusing to bifurcate a claim of breach of a settlement contract from claims of strict liability, negligence, breach of warranty, and misrepresentation. The jury returned a general verdict of $100,410.51, and we reversed due to substantial prejudice caused by the inadmissible evidence concerning the settlement agreement, which was presented to the jury. In *Missouri Pac. R.R. Co.* v. *Arkansas Sheriff's Boy's Ranch, supra,* we held that the defendant railroad company was prejudiced by the joinder of claims by 16 landowners against it, with each claiming punitive damages, because this called undue attention to the need to punish the tortfeasor. We noted that there were common questions of law and fact in the punitive-damages claims, but we concluded that severance was appropriate in that case for purposes of determining punitive damages because consolidation substantially prejudiced the defendant. *See also Clay* v. *State,* 318 Ark. 550, 886 S.W.2d 608 (1994) (criminal case where prejudice resulted from trying defendant for five sex offenses involving different defendants at different locations over a period of 12 months).

It is apparent in this case that *as related to Don Pennington* there were common questions of law and fact in the Oldner/Pennington, Armstrong/Pennington, and Tumblson/Pennington conspiracies. The Tumblson appellants, however, as contrasted to Don Pennington, shared no common questions of law or fact with the other conspiracies. The Tumblson appellants contend that the Pennington hub was not enough to overcome the substantial prejudice that resulted from trying the unrelated cases together. Harvest Foods parries that argument with its contention that the schemes were sufficiently related in time, place, and *modus operandi* to justify trying them together. The company asserts that the common scheme among all of the defendants was to "take what you can from the henhouse (Harvest) while the fox (Pennington) is guarding the door."

First, it is necessary to address Harvest Foods's contention that there was sufficient evidence of a conspiracy among all the

defendants. If there was no common scheme and the Tumblson appellants were prejudiced at trial, the trial court abused its discretion in denying the motions to sever. To prove the fox-in-the-henhouse argument, Harvest Foods had to show knowledge of the conspiracies on the part of the actors. *See Kotteakos* v. *United States,* 328 U.S. 750 (1946) (criminal case). Harvest Foods's assertion that Armstrong, Oldner, and the Tumblsons were acting in concert because each shared consulting fees with Pennington — or, in the case of the Tumblsons, income from T.S.P. — does not by itself show knowledge of the other conspiracies. The only evidence of a combined conspiracy is the existence of the hub, Pennington. There is nothing connecting the spokes of that wheel and thus nothing exhibiting knowledge among the separate conspiracies. In short, we fail to perceive the common questions of law and fact that are necessary to link the Tumblson appellants to the Oldner/Pennington and Armstrong/Pennington conspiracies.

Nor do we agree with Harvest Foods that the Court of Appeals's decision in *Dooley* v. *Cecil Edwards Constr. Co., Inc.,* 13 Ark. App. 170, 681 S.W.2d 399 (1984), decides the matter. In *Dooley,* a general contractor (Edwards) hired a plumbing concern (Cooksey) as a subcontractor to work on five projects for the owners. Cooksey testified that he had a separate agreement with the owners to bill them directly for work done. Edwards and Cooksey then sued the owners for failure to pay, and the owners moved to sever the actions. The trial court denied the motion, and the Court of Appeals affirmed on the basis that both plaintiffs were involved in the same series of transactions with the owners and there were common questions of law and fact in the two actions. In particular, the appellate court pointed to the necessity to establish the billing arrangements among the owners, Edwards, and Cooksey. That situation is a far cry from the case before us. Here, there was no proven linkage among the Tumblsons, Oldner, and Armstrong, when Pennington was removed from the picture.

We next must address whether the Tumblson appellants were prejudiced by the failure to sever under Rule 20(b) or Rule 42(b). Judicial economy unquestionably was served by combining all of the Harvest Foods claims for the three conspiracies. Nevertheless, that laudable goal must be weighed against unfair prejudice to a litigant. The jury in this case sat through almost four weeks of trial that culminated in nearly 7,000 pages of record. The majority of

the witnesses called by Harvest Foods to testify about the various schemes gave testimony about the Oldner/Pennington conspiracy and the Armstrong/Pennington conspiracy. We conclude that by necessity there was unfair prejudice to the Tumblson appellants due to the spillover evidence which made them more readily culpable in the eyes of the jury because of their apparent association with Oldner and Armstrong. Although there was strong evidence of self-dealing on the part of Joel Tumblson, Sr., that evidence was improperly bolstered by the fact that Pennington had involved food brokers (Oldner and Armstrong) in different conspiratorial schemes against the company. While this evidence may have been relevant for the case against Pennington, it was wholly irrelevant to the Tumblsons' case.

Harvest Foods argues that the proof of the other two conspiracies would have come in against Pennington in a separate trial for the Tumblson/Pennington conspiracy under Rule 404(b) of the Arkansas Rules of Evidence as proof of motive, knowledge, or intent. Thus, the company questions the existence of prejudice. We see a marked distinction between introduction of proof of conspiratorial intent related solely to Pennington as compared to a joint trial with the alleged conspirators of three separate and distinct conspiracies seated together as defendants. Nor are we convinced that an instruction to the jury to separate the conspiracies and special interrogatories to the jury cure the prejudice.

It is easy to be seduced by the appeal of judicial economy. Here, however, we conclude that the mountain of evidence against Oldner and Armstrong and their relationship with Pennington could only have disparaged the ability of the Tumblson appellants to receive a fair trial. We hold that the trial court, which was ambivalent on the severance point from the outset, abused its discretion in denying severance.

## II. Damages

The Tumblson appellants further claim that it was error to submit damages of both lost profits to Harvest Foods and benefits received by the conspirators because the theories conflicted. They further contend that Harvest Foods should have been required to choose one or the other theory of damages.

The trial court gave the following instruction to the jury:

If an interrogatory requires you to assess the damages of Harvest Foods in connection with the transactions involving T.S.P., Inc., or Top Spread Potato, Inc., you must then fix the amount of money which will reasonably and fairly compensate Harvest Foods for any of the following elements of damage:

First, the value of any benefits received as the result of the breach of a fiduciary duty, the conspiracy to breach a fiduciary duty or the aiding and abetting of the breach of a fiduciary duty; or

Second, the value of any lost profits by Harvest Foods as a result of the breach of a fiduciary duty, the conspiracy to breach a fiduciary duty or the aiding and abetting of the breach of fiduciary duty.

Whether either or both of these elements of damage has been proved by the evidence is for you to determine.

The Tumblson appellants read this instruction to mean that the jury could have understood the last sentence of the instruction to mean that it could combine both theories of damage for a recovery.

We disagree. The instruction reads in the alternative. Moreover, we have said that a plaintiff is not required to select a theory of damages before trial but may pursue both remedies until the time that the jury is instructed, when it must be made clear that the jury is required to choose one or the other. *Smith v. Walt Bennett Ford, Inc.*, 314 Ark. 591, 864 S.W.2d 817 (1993). While we find the instruction minimally sufficient to apprise the jury of its duty to assess damages under only one theory, for purposes of retrial, we underscore the necessity to state this charge with clarity. The instruction directing the jury to choose one theory of damages should be made even clearer to eliminate any confusion.

We are concerned, nevertheless, by the jury verdict of $3,250,000 against the Tumblson appellants. There appears to be no rhyme or reason for this amount. The Tumblson appellants assert that the jury was left to speculate about the amount of lost profits. They contest the methodology used by Dr. Charles Venus where he took the "before-and-after" data from Roy Kipp relating to T.S.P. sales to Harvest Foods and extrapolated that into lost profits to the company for the three years and nine months in question. Total lost

profits, according to Venus, were $5,700,000.

Robert Rough, former Chief Financial Officer for Harvest Foods, offered a benefits-received analysis. He calculated damages for ill-gotten gains to the conspirators of more than $1,300,000. Liles Henry, an accountant for the Tumblson appellants put the total figure for restitution by the conspirators at substantially less than the Rough figure — $276,750 for Pennington and $265,878 for Joel Tumblson, Sr., and Soundra Tumblson. Thus, the jury had multiple calculations for damages before it. Yet none appears to correspond to the verdict of $3,250,000.

■ This court is exceedingly reluctant to question a jury verdict. At the same time, the verdict must have some relationship to the damages proved. Either the jury agrees with the evidence of damages or it does not. Here the verdict suggests confusion or even speculation on the part of the jury. The questionable award adds additional weight to our decision to remand for a new trial.

### III. Fiduciary Duty

■ For purposes of retrial, we address the argument that Joel Tumblson, Sr., owed no fiduciary duty to Harvest Foods because he was neither an officer nor a director of the corporation but only a manager. Our Business Corporation Act does not specifically address the fiduciary duty of a manager. See Ark. Code Ann. §§ 4-27-830 to 831, 4-27-842 (Repl. 1996). Nevertheless, this court has stated that a manager owes a fiduciary duty to his business. See Tandy Corp. v. Bone, 283 Ark. 399, 678 S.W.2d 312 (1984); see also Raines v. Toney, 228 Ark. 1170, 313 S.W.2d 802 (1958). We see no reason to diverge from our previous statements on this point.

Reversed and remanded.

GLAZE, J., dissents.

TOM GLAZE, Justice. I respectfully dissent. An order of consolidation is a matter of discretion with the trial judge, and this court has held that it will not reverse such an order except for abuse of that discretion. Mo. Pac. R.R. Co. v. Ark. Sheriff's Boys' Ranch, 280 Ark. 53, 655 S.W.2d 389 (1983); Ark. R. Civ. P. 42(b). The purpose of Rule 42(b), this court's rule permitting consolidation, is to further convenience, avoid delay and prejudice, and serve the needs of justice. Ciba-Geigy Corp. v. Alter, 309 Ark. 426, 834 S.W.2d 136

(1992). The primary concern is efficient judicial administration, as long as no party suffers prejudice by the bifurcation. *Id.* at 436.

The rule in Arkansas regarding severance is that, where the defendants were involved in the same series of transactions, and where, at trial, the testimony revealed that there were questions of law and fact common to the defendants that arose in their actions, a trial court's decision to permit joinder of the defendants is correct and prevents needless waste of scarce space on the court's docket. *Dooley v. Cecil Edwards Construction Co.*, 13 Ark. App. 170, 681 S.W.2d 399 (1984).

The Tumblsons argue that the trial court's rationale for denying severance for judicial economy cannot stand. They cite *Ciba-Geigy Corp.* where this court held that "in no area of law are we disposed to promote the interests of judicial economy over a party's right to receive a fair trial." 309 Ark. at 437. However, the facts in *Ciba-Geigy* are so dissimilar to the present case that it is inapplicable. In *Ciba-Geigy*, the trial court joined a strict liability claim for damages with a claim asserting breach of a settlement agreement arising out of the same dispute. Because evidence of settlement negotiations are inadmissible under Ark. R. Evid. 408, that court's ruling was clearly reversible error.

The Tumblsons also contend that Ark. Rule Civ. P. 20(a), the permissive joinder rule, is not applicable to this case, because there were no common questions of fact or law between the defendants. They argue that there is no civil conspiracy here, defined by this court as "a combination of two or more persons to accomplish a purpose that is unlawful or oppressive or to accomplish some purpose, not in itself unlawful, oppressive, or immoral, by unlawful, oppressive or immoral means, to the injury of another." *Mason v. Funderbank*, 247 Ark. 521, 446 S.W.2d 543 (1969). The Tumblsons compare the present case to *Kotteakos v. United States*, 328 U.S. 750 (1946), wherein the Court found a lack of interdependence between the thirty-two defendants on trial and eight conspiracies they were accused of to support a conspiracy theory.

However, Harvest Foods contends, and I agree, that the common thread between the defendants here is the corruption of Don Pennington, Harvest Food's former CEO. It states that the same proof that shows the defendants' common scheme would have been admissible at separate trials because it proves intent to defraud Har-

vest Foods. *See* Ark. Rule Evid. 404(b); *Blaylock* v. *Strecker*, 291 Ark. 340, 724 S.W.2d 470 (1987).

In my view, evidence of Pennington's contemporaneous breaches of fiduciary duties alongside the other defendants showed that Pennington and his cohorts were not merely consulting, but consciously working with the same purpose or object in mind — to defraud Harvest Foods. In other words, while all of the schemes and conspiracies involved some slight variations in how they were conducted, they were all designed and calculated to defraud Harvest Foods during essentially the same period of time. In my opinion, this proof evidences a question of fact common to all the defendants in this case, thus satisfying the requirements of this court's permissive joinder and consolidation rules. At the very least, I cannot say the trial judge abused his discretion in finding these defendants should be made party-defendants in this conspiracy case.