Mike NAZARENKO *v.* CTI TRUCKING CO., INC. &
Randy Justice

93-118                                        856 S.W.2d 869

Supreme Court of Arkansas
Opinion delivered June 28, 1993

*Wright, Chaney, Berry & Daniel, P.A.*, by: *Don P. Chaney* and *Benny M. Tucker*, for appellant.

*Walter A. Murray*, for appellee.

JACK HOLT, JR., Chief Justice. Mike Nazarenko sued CTI Trucking Co., Inc. (CTI) and its driver, Randy Justice, appellees, for his injuries and damages resulting from their negligence. The jury returned a verdict in the appellees' favor. Mr. Nazarenko then filed a motion for a new trial claiming the trial court committed an error of law by permitting testimony favorable to the appellees in violation of the collateral source rule. The trial court denied the motion and Mr. Nazarenko appeals. We agree with the trial court and affirm.

Mr. Nazarenko sustained back injuries during the delivery of a roll of carpet by CTI to his employer, Sherwin-Williams, located in Arkadelphia. According to Mr. Nazarenko, he and Mr. Justice were unloading a large roll of carpet using a "carpet jack"

when Mr. Justice pushed the roll and caused a steel pipe part of the carpet jack to strike Mr. Nazarenko in the chest. To avoid being crushed, Mr. Nazarenko caught the raised carpet roll weighing about 800 bounds. He alleged that this caused his back injury which required surgery.

Mr. Nazarenko brought suit claiming that Mr. Justice was negligent in handling the roll of carpet as it was being unloaded from the truck and that he was entitled to monetary relief for the resulting damages he suffered. After the jury returned a verdict for CTI, Mr. Nazarenko filed a motion for a new trial on the basis that the trial court committed an error of law in allowing defense counsel to proceed with a line of questioning which violated the collateral source rule.

In ruling against Mr. Nazarenko on this motion, the trial court found:

> The Court granted a pre-trial motion in limine whereby the Defendant's counsel was prohibited from mentioning Workers' Compensation or bringing such matter to the jury's attention.

> The first witness called by the Plaintiff was Mitch Fendley [Branch Manager of Sherwin-Williams] and he testified about Workers' Compensation.

> The Plaintiff testified he had not been going back to the doctor as he could not afford it. He further testified he couldn't go back to Henderson State University as he owed them a bill and could not pay it.

> The defense in chambers requested that they be allowed to cross-examine the Defendant concerning the Workers' Compensation settlement where he received medical payments and a sum of money, that he testified before the Law Judge that he was going to use the money to pay his bills and return to college. The Court denied the defendant the right to present such testimony unless the Plaintiff continued to "open it up" before the jury. In other words, the Court would not allow the jury to be mislead [sic] by the Plaintiff.

> The trial continued and there was no mention of

insurance, nor [sic] was it inferred.

. . . .

Under the facts before us, we cannot say that the trial court erred in denying the motion for a new trial.

The record reveals the trial court granted a pretrial motion in limine prohibiting CTI from referring to Mr. Nazarenko's workers' compensation payment which covered some of his medical bills. However, this information was furnished to the jury by Mr. Nazarenko's own witness, Mitch Fendley, the branch manager of Sherwin-Williams, when Mr. Fendley stated on direct-examination that on the day of the incident he "suggested that [Mr. Nazarenko] go to the doctor and, of course, that day I called — Sherwin-Williams has an eight hundred number for their workers' compensation program within the company." He next said, "I called them and notified them, and we had Mike [Nazarenko], I believe, report to Dr. John Bomar for treatment."

In his brief, Mr. Nazarenko states that he is not seeking appellate relief because Mitch Fendley's testimony was "presented to the jury unsolicited by him and was prejudicial to him" since his own attorney brought workers' compensation out on direct examination, but instead he "has come before this court seeking relief . . . because appellee's counsel then intentionally and deliberately aggravated the prior injection of workers' compensation to the jury with his questioning of Mr. Nazarenko." Mr. Nazarenko supports his position by quoting at length trial testimony and exchanges between the court and counsel as follows.

Mr. Nazarenko testified on direct examination:

Q: Since Dr. Gocio released you, have you had flare-ups from time to time with your condition?

A: Yes, sir.

Q: Have you been going to the doctor?

A: No, sir.

Q: Why not?

A: I really couldn't afford to go see him, and at one

time when I was still kind of like in his care, I couldn't get over to Hot Springs. I didn't have a car at the time. I didn't have a phone, and basically it wasn't because of the money problem.

Q: Did you go back to see Dr. Bomar recently?

A: Yes, sir, I did.

Q: Did Dr. Gocio refer you back to his care?

A: Dr. Gocio said it would be all right for me to see Dr. Bomar. He didn't have any objections to it. He was talking that I would need some kind of like a rehabilitation, and he agreed that Dr. Bomar would be all right to see.

After these questions, the following bench conference took place out of the hearing of the jury.

Mr. Murray (Defense Counsel): Judge, the evidence, from the testimony of Dr. Gocio, is that this gentleman didn't seek medical attention for a period of a year or a year and a half.

Mr. Chaney (Plaintiff's Counsel): What?

Mr. Murray: The Claimant, from 1991 until sometime in 1992, has testified that he didn't get medical treatment because he couldn't afford it. I think he's opened the door for me to inquire, not about insurance, but about the fact that his medical bills had, in fact, been paid.

Mr. Chaney: I would strongly disagree with that, your Honor. He testified the bills had been incurred, and then the future medical care that Dr. Gocio predicted that he would need, five hundred to a thousand a year — he hasn't been spending that in the last year or so.

Mr. Murray: He said he hadn't gone to the doctor because he couldn't afford it. That's why he didn't go back —

Mr. Chaney: We're talking about the future medical.

Court: Mr. Murray, I'm going to overrule your request, and let's proceed.

Mr. Murray: Okay, thank you.

Mr. Nazarenko later testified as follows upon cross-examination.

Mr. Nazarenko: When I worked at Sherwin-Williams, I had to take the hours that I was getting. They only have so many hours allotted to part-time employees, and I got as many hours as I could get.

Q: You lack 9 hours having your college degree in Sociology?

A: Yes, sir.

Q: Are you working on that now?

A: No, sir, I have to pay back a grant that I lost in '88 before I can return to school, and that's been a problem right now.

Q: Do you remember testifying in February of 1992, here in Arkadelphia, Arkansas, that you were planning on going back to school, getting those 9 hours, and taking a sit-down type job?

A: What time was this?

Q: February of 1992.

A: I don't recall who I would have talked to about that. I've talked to a number of people about returning back to school, but I don't recall talking to you about it.

Q: No, you didn't talk to me.

A: Okay.

Q: You were testifying in February of '92 that you planned to go back to college —

A: Who was I testifying to cause I don't — the only time I remember testifying was to you back in July of '91, I believe.

At this time, CTI's counsel stated that he did not want to risk the possibility of a mistrial, and the trial judge asked the attorneys to approach the bench. The following conversation then took

576 .

place:

> Mr. Murray: He testified before Dail Stiles [the administrative law judge] that he was going to take his [workers' compensation] settlement in the amount of $8900.00 and go back to school.

> Mr. Chaney: Your Honor, I would say that this is just highly prejudicial and it's designed to circumvent making an end run around the Court's previous ruling not to talk about insurance.

> Mr. Murray: Well, Judge, in that regard, they opened up insurance a long time ago in the voir dire, after they were he ones that requested the —

> Mr. Chaney: No. No sir.

> Court: In order words, what you're saying is that he made his statement under oath that he was going to go back to school to take 9 hours —

> Mr. Murray: And get him a sit-down job.

> Court: Well, what he doesn't understand right now is who you were talking about, or where that statement was made.

> Mr. Chaney: Your Honor, I think it would be highly prejudicial to open the door to bring out the whole worker's compensation deal at this stage of the game.

> Mr. Murray: I think it is, too. You're the ones that opened the door, not me.

> Mr. Chaney: No, sir, he's the one asking the questions. He's trying to open his own door.

> Court: Workman's Comp. came out on Fendley's statement on direct.

> Mr. Murray: It sure did.

> Mr. Chaney: It didn't come out that he got any benefits.

> Mr. Murray: See what they want is the advantage of certain testimony and then the part that hurts them, they

don't want that before the jury, and I don't want to risk a mistrial.

Mr. Chaney: Mr. Murray is the one eliciting the testimony.

Court: I can see where he would want the statement in, but to do so is going to open up the — I can see it just as sure as the world that he's going to end up saying it was before a worker's comp. judge. I don't see how you're going to get around it.

Mr. Chaney: It's not relevant, your Honor, what happens in a worker's comp. case about what somebody's plans might be.

Court: I don't think it's worth the risk of opening it up. Can you go on without it?

Mr. Murray: I think I can.

Court: Okay. Proceed.

Mr. Nazarenko was further questioned on cross-examination by CTI's attorney:

Q: When you went to college, you went to college on a football scholarship? Is that correct:

A: Yes, sir.

Q: And what are you having to pay back?

A: It's a grant.

Q: A grant?

A: It's a grant that was supposed to pay for a year's worth of schooling.

Q: Why would you have to pay a grant back?

A: Something came up that I did not have enough hours to qualify for the grant, and they had let me into school at the time with the saying that I would have the grant, and I come to find out at the end of the year, spring of '88, and when I got ready to go back in the fall of '88, they said that I was having to pay back $915.00 to the school.

Q: $915.00?

A: Yes, sir.

Q: And that's the reason you're not going to school now?

A: Yes, sir.

At this point, another bench conference was held:

Mr. Murray: His [workers' compensation] settlement was for $8900.00, and he just now said the reason he couldn't go back to school was because he had to pay back $900.00, and he told Judge Stiles that he planned to go back to college to get his degree with that money. Now, if I can ask what he told Judge Stiles, in February of 1992, that he intended to go back to college, that's what I would like to do.

Court: And you won't mention any money?

Mr. Chaney: Well, he's trying to open his own door again, Judge. The man was way behind on his bills, and what he might plan to do in one case is simply not relevant to this action.

Mr. Murray: I don't know anything about his being behind on his bills. He hasn't testified to any of that, Judge.

Court: I guess the problem is if he got eight thousand dollars case money, and he says he couldn't go back to school because he couldn't pay the nine hundred and fifteen, it would become relevant that — well, it would appear that he'd say one thing under oath one time, and then something else under oath at another time. That's to his credibility, is where he's going.

Mr. Murray: That's exactly what I'm referring to, Judge. I won't mention workers' comp. I'll just ask him if he told Judge Stiles he was going to take $8900.00 that he got and go back to school.

Mr. Chaney: He wants to taint this whole thing with the workers' comp.

Court: Okay, are you referring to him as Dail Stiles?

Mr. Murray: Yes, I'll do that. I'll leave administrative law judge and workers' comp. totally out of it.

Court: In other words, you won't go any further about money or anything else, as far as the settlement or anything like that, just detail Dail Stiles as that because I don't—

Mr. Murray: I'm just going to ask him if when he got $8900.00, did he tell Dail Stiles he was going to take that money and go to college, and get his nine hours, and get him a sit-down job.

Mr. Chaney: Which is an attempt to taint this trial with that prejudicial evidence when he is eliciting this whole line of testimony himself.

Mr. Murray: Judge, it's the credibility of the witness.

Court: Of course, the only problem is, like I say, Fendley said on opening that he reported the injury to his workers' compensation.

Mr. Murray: I'll leave insurance and workers' comp. totally out of it.

Court: They're aware already of workers' comp.

Mr. Chaney: Well, it's prejudicial for the jury to know that collateral source benefits are received whether they're workers' comp. or social security, and Mitch didn't say anything about him getting any benefits.

Mr. Murray: We're not talking about collateral source. We're not going to discuss workers' comp.

Mr. Chaney: It is a collateral source, and you just said you want to tell them he got $8900.00.

At this time an in camera conference was held off the record and out of the hearing of the jury. The trial then resumed.

Mr. Nazarenko's testimony on cross-examination by Mr. Murray continued:

Q: Do you have any outstanding medical bills at this time?

Mr. Nazarenko: Outstanding medical bills — I've got a—

Q: That hasn't been paid?

At this time, another bench conference was held out of the hearing of the jury:

Mr. Chaney: He's doing it again, your Honor, trying to come in with an improper line of questioning. The Plaintiff can say he incurred the bills, and it would be highly improper and prejudicial to start questioning him about what got paid and what's not—

Mr. Murray: I just asked if he had any unpaid bills. I think that's a fair question. It's that he paid them or didn't pay—

Mr. Chaney: It's an improper line of questioning.

Court: It's stipulated that he incurred fourteen thousand—

Mr. Murray: Fourteen thousand worth of medical. We'll stipulate that he incurred them. I just want to know if he's got any outstanding ones.

Mr. Chaney: That's an improper questioning.

Court: I'm going to overrule.

Mr. Nazarenko's cross-examination by Mr. Murray continued:

Q: Do you have any outstanding medical bills?

Mr Nazarenko: I'm not real sure what you mean by outstanding medical bills.

Q: Not paid.

A: Not that I'm aware of. I do receive bills in the mail from a Dr. Pellegrino, and I have — that's all that I know of. I've seen Dr. Bomar since then, and if those are outstanding and haven't been paid for, then I assume that they're outstanding.

Q: You saw Dr. Bomar just a short time ago before

this trial, right?

A: Yes, sir.

Based on these excerpts and Mr. Nazarenko's arguments on appeal, we glean that the crux of his complaint is that the cumulative effect of defense counsel questioning him about unpaid medical bills and unpaid college debts violated the collateral source rule and that the trial court was in error in not granting a new trial.

Arkansas R. Civ. P. 59 governs the award of a new trial to a party in a lawsuit. Rule 59(a) sets out eight grounds for the granting of a new trial and, without citing this rule, Mr. Nazarenko presumably argues on appeal he is entitled to a new trial pursuant to the eighth ground, error of law, because the collateral source rule was violated. Under Ark. R. Civ. P. 59(a)(8), a new trial may be granted where an error of law occurred at trial and was objected to by the party making the application and that error materially affected the substantial rights of the moving party.

We summarized the error of law argument for a new trial in *Security Ins. Co.* v. *Owen*, 255 Ark. 526, 501 S.W.2d 229 (1973):

Error of law occurring at the trial and objected to by the moving party is one of the statutory grounds for a new trial. The trial court has a broad latitude of discretion in the granting of new trials. This discretion is not limited to cases where sufficiency of the evidence is the ground for the motion. Of course, the latitude of the trial judge's discretion is much broader where the question is whether a jury verdict is supported by a preponderance of the evidence, because of the peculiar advantage of his position in evaluating all the factors bearing upon it. In determining questions as to errors of law, his position is not of the same superiority to that of the appellate court. Still, the action of the trial judge on a motion for new trial upon a statutory ground should not be reversed in the absence of manifest abuse of his discretion.

. . . .

Manifest abuse of discretion in granting a new trial

means a discretion improvidently exercised, i.e., exercised thoughtlessly and without due consideration. Under the circumstances prevailing here we are unable to say that the circuit judge exercised his discretion improvidently, thoughtlessly or without due consideration.

*Security Ins. Co.* at 529-30, 501 S.W.2d at 231-2 (citations omitted). *See also Crowder* v. *Flippo*, 263 Ark. 433, 565 S.W.2d 138 (1978).

On appeal, Mr. Nazarenko cites *Patton* v. *Williams*, 284 Ark. 187, 680 S.W.2d 707 (1984) in support of his argument, but his reliance on our holding in *Patton* is misplaced. In *Patton*, the appellee's attorney conducted his cross-examination of the appellant in such a way that he invited comment on the payment of certain medical bills by a collateral source and then used the appellant's response to portray him as being an untruthful person, when, in fact, the appellant had told the truth. The record before us does not reflect any similarities between the conduct of counsel in this case and counsel in *Patton.*

Here, evidence of workers' compensation coverage was first brought to light by Mr. Nazarenko's own witness and not mentioned again until Mr. Nazarenko, on direct examination, testified that he could not afford to go see a doctor. Obviously, his testimony in this regard was subject to cross-examination on this point. We cannot say that CTI's counsel, on cross-examination, invited comment as to payment by a collateral source and then attempted to use his response to show he was an untruthful person.

There are close similarities between this case and our recent decision in *Babbitt* v. *Quik-Way Lube & Tire, Inc.*, 313 Ark. 207, 853 S.W.2d 273 (1993) in which we held there was no error where the trial court allowed a defense attorney to cross-examine a plaintiff in a tort case on insurance coverage after the plaintiff testified that she had not been to a doctor to obtain medical care because she didn't have the money when she in fact had medical coverage under her husband's insurance policy. We said:

Our recent case of *Younts* v. *Baldor Elec. Co.*, 310 Ark. 86, 832 S.W.2d 832 (1992) controls. There, during

direct examination, counsel asked Younts whether he had been able to reopen his business after the fire, and Younts said, "Haven't been able to afford it." Defense counsel argued during an in-camera hearing that Younts' testimony opened the door for counsel to show Younts had received an insurance settlement. The trial court agreed, and we affirmed on appeal. In doing so, we cited the general rule that it is improper for either party to introduce or elicit evidence of the other party's insurance coverage and stated this principle is part of the collateral source rule which excludes evidence of benefits received by a plaintiff from a source collateral to the defendant.

*We further recognized in Younts, that, when a party testifies about his or her financial condition in a false or misleading manner, he or she opens the door for the introduction of evidence which might otherwise be inadmissible under the collateral source rule. See also Peters* v. *Pierce*, 308 Ark. 60, 823 S.W.2d 820 (1992). In upholding the trial court's rule to allow defense counsel to inquire of Younts' insurance settlement, we stated as follows:

It is important to recognize that Younts' testimony came when he was being questioned by his own counsel. The question asked was whether he had rebuilt the physical facilities of his business. The question was wholly irrelevant to any question in the case other than possibly that of mitigation of damages which does not appear to have been at issue. The dissenting opinion seems to conclude as a matter of fact that Younts was telling the truth or that he answered in good faith. We have no way to determine that. Appellate courts do not make those decisions. The important point is that Younts' response that he could not afford to rebuild could very well have been misleading to the jury. In *Peters* v. *Pierce, supra,* and in *York* v. *Young*, [271 Ark. 266, 608 S.W.2d 20 (1980)], we held that in such a situation the collateral source rule does not prevent introduction of evidence of insurance.

In the present case, Babbitt's counsel invited Babbitt

to explain why she saw him before having seen a doctor. The purpose of such questioning was to give Babbitt an opportunity to say, "I didn't have the money . . . [t]hey want their money up front when you go to the doctor . . . I didn't have the money then." As was the situation in *Younts*, Babbitt's counsel's question and Babbitt's response had no relevance to any issue in the case. Instead, Babbitt's testimony that she could not go to a doctor for treatment could have mislead the jury. Under these facts, we are unable to say the trial court abused its discretion in permitting Quik-Way's counsel to elicit information that afforded the jury a complete and full picture of Babbitt's financial situation.

*Babbitt* at 210-11, 835 S.W.2d at 275 (emphasis added). *See also Evans* v. *Wilson*, 279 Ark. 224, 650 S.W.2d 569 (1983) (one of the four exceptions to the collateral source rule is where collateral source evidence is used to rebut the plaintiff's testimony that he was compelled by financial necessity to return to work prematurely or to forego additional medical care), *rev'd on other grounds*, 284 Ark. 101, 679 S.W.2d 205 (1984).

In light of our holdings in *Younts* and *Babbitt*, we cannot say that there was a manifest abuse of discretion on the part of the trial court.

Mr. Nazarenko also argues that CTI's counsel further aggravated the prior injection of workers' compensation into the trial by stating in closing argument that Dr. Gocio had testified that Mr. Nazarenko's medical bills had been paid. Examination of the record reflects that Mr. Nazarenko did not object to this statement during closing, nor did he request the trial court to instruct or admonish the jury concerning the remarks of counsel in this regard. As we said in *Miller* v. *State*, 309 Ark. 117, 120, 827 S.W.2d 149, 150 (1992), "few tenets are more firmly established than the rule requiring a contemporaneous objection in order to preserve a point for review on appeal." *Watson* v. *State*, 290 Ark. 484, 720 S.W.2d 310 (1986). Thus, this issue was not properly preserved for appeal. *See also Sheridan* v. *State*, 313 Ark. 23, 852 S.W.2d 772 (1993) (court's failure to give an admonitory instruction was not prejudicial error in the absence of a request).

For all the foregoing reasons, we affirm.