FMC CORPORATION, INC., and Agro Distribution, LLC *v.* Roy HELTON, d/b/a Helton Farms; Joyce Clifton and Ricky Clifton, d/b/a Clifton Farms Joint Venture; Riddell Flying Service, Inc.; Gibbons Flying Service, Inc.

and

Roy Helton, d/b/a Helton Farms; Joyce Clifton and Ricky Clifton, d/b/a Clifton Farms Joint Venture *v.* Agro Distribution, LLC, and Land O'Lakes, Inc.

04-215                                          202 S.W.3d 490

Supreme Court of Arkansas
Opinion delivered February 3, 2005

*Womack, Landis, Phelps, McNeill & McDaniel*, by: *John V. Phelps, Jeffrey W. Puryear*, and *Mark Mayfield*; and *Butler, Snow, O'Mara, Stevens & Cannada, PLLC*, by: *Lee Davis Thames*, for appellant FMC Corporation.

*Bridges, Young, Matthews & Drake, PLC*, by: *Joseph A. Strode*, for appellant Agro Distribution, LLC.

*Nix, Patterson & Roach*, by: *Brady Paddock* and *Anthony Bruster*; and *Bond & Chamberlin*, by: *Will Bond* and *Neil Chamberlin*, for appellees Helton and the Cliftons.

*Quattlebaum, Grooms, Tull & Burrow, PLLC*, by: *John E. Tull, III, E. B. Chiles, IV*, and *Brandon B. Cate*, for appellee Riddell Flying Service, Inc.

*Friday, Eldredge & Clark, LLP*, by: *Donald H. Bacon*, for appellee Gibbons Flying Service, Inc.

Donald L. Corbin, Justice. This case arises from a jury verdict awarding damages resulting from the application of the insecticide Fury to the wheat crops of two farms located in Phillips County, Arkansas. Appellants raise numerous points on appeal. There are questions involving interpretation of our statutes; hence, our jurisdiction of this case is pursuant to Ark. Sup. Ct. R. 1-2(b)(6). We reverse and remand for a new trial.

Before setting forth the necessary facts, it is helpful to review the parties in this case, as well as their roles in the instant litigation. Appellants are FMC Corporation, Inc., and Agro Distribution,

LLC. FMC is the manufacturer of Fury. Agro is a distributor of chemical products, including Fury. Land O'Lakes, Inc., is a fifty percent owner of Agro and is the subject of the cross-appeal. Appellees in this case include Roy Helton, d/b/a Helton Farms and Joyce Clifton and Ricky Clifton, d/b/a Clifton Farms Joint Venture. It was these two farming operations that were growing the wheat on which Fury was sprayed. Also included as Appellees are two flying services who are licensed under Arkansas law to spray pesticides on crops, Riddell Flying Service, Inc., and Gibbons Flying Service, Inc. These two flying services were the ones who sprayed Fury on the wheat crops.[1]

In March 2001, Tyrus Teague, a salesman for FMC, made a routine sales call to Doug Davidson, manager of Agro's facility in Holly Grove, Arkansas. They discussed the FMC line of products. They also discussed the fact that FMC had applications pending before the Environmental Protection Agency to expand the legal uses of Fury to additional products, including wheat.

At the end of April 2001, J.R. Davidson, a salesman for Agro, detected a heavy concentration of armyworms in the Helton and Clifton wheat fields. Armyworms can be devastating to a wheat crop because they eat the leaves on wheat and ring the head causing it to fall off. J.R. contacted his manager at Agro's Holly Grove location, Doug Davidson, to determine what products Agro would sell for use on wheat. In turn, Doug contacted some manufacturers' sales representatives to get a product recommendation and the recommended rate of application. One such call was to Teague who recommended the use of Fury and provided an application rate. Doug reported this recommendation to J.R., and the Fury was loaded and delivered to Riddell Flying Service and Gibbons Flying Service. J.R. wrote the rate of application on the receipt tickets left with the flying services. The pesticide was applied to the wheat crops of the two farms and killed the armyworm infestations. A few days later, however, Doug received a phone call from a pilot, informing him that Fury had not yet been approved for use on wheat. Agro, in turn, notified Appellees, as well as other farmers who had recently purchased Fury.

It was soon discovered that similar incidents involving the use of Fury on wheat occurred in Mississippi and that the Missis-

---

[1] For purposes of clarity, when the opinion refers to Appellees, it is referring to Helton and the Cliftons.

sippi Department of Agriculture had begun an investigation. The Arkansas Plant Board subsequently launched its own investigation in May 2001, and a quarantine was instituted on all wheat that had been sprayed with Fury. As a result of the quarantine, Appellees were initially prevented from harvesting their wheat. They finally received approval to cut the wheat, but had to locate storage for the adulterated wheat until the quarantine was resolved.

Upon learning of the quarantine, Agro employees, along with Kevin Conrad, an employee of parent company, Land O'Lakes, held a conference call. They decided that Doug Davidson would be responsible for assisting affected customers in locating storage facilities for the quarantined wheat. At some point, Appellees were told that either FMC or Agro would be responsible for the transportation and storage costs of the adulterated wheat.

During this time, a meeting was held in Mississippi, at which several FMC employees and representatives of various state and federal agencies explained that a program was being created to allow FMC to purchase the adulterated wheat and reimburse the farmers for the additional transportation and storage charges. Doug Davidson attended this meeting and reported what he learned to Appellees.

Donald Wilkison and Keith Wilkison, who were customers of Agro, agreed to store the Appellees' wheat in their on-site storage facilities of their farms. As part of their agreement, the wheat was to be removed by August 1, so that they could store their own rice and corn crops once they were harvested.

During the pendency of the quarantine, the United States Department of Agriculture determined that farmers who had sprayed their crops with Fury would not be eligible for their loan deficiency payments (LDP), which amounted to approximately $.37 per bushel. At that time, Helton had 37,200 bushels of wheat, and the Cliftons had 28,600 bushels. In the meantime, FMC finalized its arrangement to purchase the quarantined wheat. An offer to purchase the wheat was made on or about June 21, 2001. As part of the agreement, the farmers had to sign a release of liability. Appellees refused to sign the release and sell their wheat to FMC. By August 1, Appellees had not sold their wheat and had also failed to remove it from the Wilkisons' storage facilities. At this time, the wheat was still quarantined. Appellees refusal to sell their wheat to FMC or to otherwise remove it from the Wilkisons' storage facilities led to a dispute between Appellees and Conrad.

Conrad eventually notified Appellees that their wheat was going to be removed from the Wilkisons' storage bins and dumped onto the ground at their farms. Appellees obtained an injunction, preventing Conrad from removing and dumping their wheat.

The wheat subsequently remained in the Wilkisons' storage bins until December 27, 2001, when it was sold. The proceeds from the sale of the wheat were deposited with the clerk of the court in Phillips County. The Wilkisons attempted to assert a lien against the proceeds to cover the costs of storage. The court, however, entered an order in October 2002, directing that the proceeds be paid to Appellees, after determining that there was no basis for the Wilkisons' lien.[2]

Appellees filed their original complaint on August 9, 2001, against numerous parties for damages they sustained as a result of Fury being used on their wheat. A second amended complaint was filed on October 9, 2002. As is pertinent to the current appeal, Appellees alleged: (1) fraud/misrepresentation on the part of FMC and Agro; (2) negligence on the part of FMC, Agro, Riddell Flying Service, and Gibbons Flying Service; (3) breach of express warranty by FMC and Agro; (4) breach of implied warranty of fitness for a particular purpose by FMC and Agro; (5) violation of the Arkansas Deceptive Trade Practices Act ("ADTPA") by FMC and Agro; and (6) outrage by FMC, Agro, and Land O'Lakes, Inc.

Prior to trial, FMC and Agro filed motions for summary judgment. Appellees dismissed their claims for breach of express and implied warranties against FMC and Agro. They also dismissed their claim for outrage against FMC. Appellees subsequently nonsuited their claims against Riddell Flying Service and Gibbons Flying Service. FMC and Agro had filed cross-claims against both flying services, but the flying services filed a pretrial motion to sever. The trial court granted the motion to sever.

The case was tried before a Phillips County jury on May 13-21, 2003. At the close of Appellees' case, both FMC and Agro moved for directed verdicts on all claims. The trial court granted Agro's and Land O'Lakes's directed-verdict motions on the claim of outrage, thus dismissing Land O'Lakes from the action. The

---

[2] Appellees initially included the Wilkisons as defendants in their complaint, arguing that any money owed for storage was owed by FMC and Agro. The Wilkisons subsequently filed a cross-claim against Agro for breach of contract. This claim was severed and is not at issue in the present appeal.

remainder of the motions were denied. The directed-verdict motions were renewed at the close of all evidence and again were denied by the trial court. The case was then submitted to the jury on interrogatories.

The jury returned verdicts in favor of Appellees, apportioning fault as 10% to each Appellee; 40% to Agro; and 50% to FMC. Clifton was awarded damages totaling $527,017.16. This award consisted of economic damages of $27,017.16; damages for mental anguish of $250,000.00; and punitive damages of $250,000.00. Helton was awarded total damages of $554,085.95, which included economic damages of $54,085.95; damages for mental anguish of $125,000.00; and punitive damages of $375,000.00.

Following the trial, Appellees filed a petition requesting attorneys' fees of $217,507.50, as well as costs and postjudgment interest. Appellees argued that they were entitled to fees as they prevailed on their claim under the ADTPA. The petition sought payment for 1,242.90 hours of work performed at an hourly rate of $175.00. A supplemental petition was filed on September 22, 2003, seeking additional fees for work performed after the filing of the initial petition. The trial court awarded Appellees attorneys' fees totaling $233,572.50, as well as taxable costs totaling $1,006.67. This appeal followed.

## I. Severance

Although not raised as the first point on appeal, we will address the issue of severance first because it was reversible error for the trial court to grant Riddell's and Gibbons' motion to sever the cross-claims filed against them by FMC and Agro. In its brief to this court, FMC argues that the trial court erred in granting severance because they were prejudiced by it. According to FMC, the trial court's error was compounded by its refusal to include the flying services in the special interrogatories submitted to the jury. Likewise, Agro argues that there was no sound reason supporting severance and, thus, the trial court abused its discretion in this regard.

Appellees Helton and the Cliftons argue that the trial court did not abuse its discretion in severing the cross-claims and that it is speculative to argue that the jury would have apportioned any fault to Riddell or Gibbons.

Appellees Riddell and Gibbons, who have filed a joint brief, argue that the trial court correctly ordered severance because FMC and Agro suffered no prejudice, as they will still have the chance to

pursue their cross-claims in a subsequent trial. Moreover, Riddell and Gibbons argue that severing the cross-claims could have obviated the need for a trial on these claims if FMC and Agro had prevailed; thus, the trial court correctly determined that judicial economy warranted severance.

This court has recognized that a trial court's order pursuant to Ark. R. Civ. P. 42 is a matter within the trial court's discretion, and the court's decision will not be reversed absent a showing of abuse of that discretion. *Ciba-Geigy Corp. v. Alter*, 309 Ark. 426, 834 S.W.2d 136 (1992). Thus, the question to be resolved by this court is whether the trial court abused its discretion in severing FMC's and Agro's cross-claims against Riddell and Gibbons.

Severance of claims is provided for in Rule 42(b), which provides:

> *Separate Trials.* The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim, counterclaim, or third-party claim, or of any separate issue or any number of claims, cross-claims, counterclaims, third-party claims, or issues.

This court discussed the primary purpose underlying Rule 42(b) in *Alter*, and explained that its purpose is to further convenience, avoid delay and prejudice, and serve the needs of justice. *Id*. The court in *Alter* further explained that in evaluating a motion under Rule 42, the primary consideration is efficient judicial administration, as long as no party suffers prejudice as a result of severance. *Id*. (citing *Hunter v. McDaniel Bros. Const. Co.*, 274 Ark. 178, 623 S.W.2d 196 (1981)). In *Pennington v. Harvest Foods, Inc.*, 326 Ark. 704, 934 S.W.2d 485 (1996), this court further elaborated that the trial court's abuse of discretion could be demonstrated by a showing of prejudice to the complaining party. *Id*.

In the case at bar, it was error for the trial court to order severance for two reasons. First, severance in this case did not facilitate principles of judicial economy. Second, granting severance in this case prejudiced FMC and Agro. With regard to judicial economy, the record reveals that the two pilots responsible for spraying the wheat with Fury testified at trial. Their testimony was rather short and straightforward. To summarize, each admitted that they were licensed by the State Plant Board and that they were responsible for spraying Appellees' crops. Each pilot also admitted

that they had a duty to read the label of any insecticide they sprayed and that they did not do so in this case. Thus, the jury heard evidence regarding the role that these flying services played in this case. The jury also heard testimony that Appellees had nonsuited their claims against the flying services immediately prior to trial. Considering the fact that the pilots were present at trial and testified as to their role in this case, it is hard to fathom how severing the cross-claims promoted judicial economy.

More importantly, FMC and Agro were prejudiced by the order granting severance. They had a right to argue that the flying services were contributorily negligent and to have their argument considered in the context of this entire case. The pilots' actions are directly related to the harm alleged in this case. The jury, who was responsible for apportioning fault, heard testimony about the flying services' possible negligence, but were then told that Appellees' claims against them had been dropped. It is true that FMC and Agro could have still pursued their cross-claims in a subsequent trial, but to do so, they would be required to duplicate much of the work performed in the initial trial.

This court reversed a trial court's order denying severance in *Pennington*, 326 Ark. 704, 934 S.W.2d 485, after determining that the trial court abused its discretion. In so holding, this court noted that "[i]t is easy to be seduced by the appeal of judicial economy." *Id.* at 720, 934 S.W.2d at 494. Even though *Pennington* was a case where severance should have been granted, its rationale regarding the trial court's abuse of discretion can be applied in the instant case.

Here, the trial court reasoned that severance was appropriate because it would simplify the trial. However, this conclusion did not appropriately take into consideration the prejudicial effect severance had on FMC and Agro. As this court stated in *Alter*, "[i]n no area of the law are we disposed to promote the interests of judicial economy over a party's right to receive a fair trial." *Alter*, 309 Ark. at 437, 834 S.W.2d at 141. Accordingly, it was error for the trial court to grant severance where it did not facilitate judicial economy and resulted in prejudice to FMC and Agro.

Having determined that the trial court erred in ordering severance, we must remand this case for a new trial. Thus, it is not necessary for us to address each argument raised by FMC and Agro. There are some issues, however, that will necessarily be raised in

the course of a new trial that we are compelled to address in order to avoid any confusion on remand.

## II. Mississippi Evidence

Next, we will consider FMC's argument that the trial court erred in refusing to exclude evidence related to allegations that Fury was sprayed on wheat crops in Mississippi. Specifically, FMC avers that the claims at issue in this case involve individuals, corporations, and farms in Arkansas only and, as such, the trial court abused its discretion in allowing evidence to be presented to the jury regarding communications and events that took place outside this state. FMC specifically challenges evidence regarding the off-label use of Fury on farms in Mississippi; national sales information; evidence of meetings that took place in Mississippi relating solely to Mississippi product applications; and, information regarding Mississippi farmers affected by the use of Fury. Moreover, FMC challenges the trial court's allowing Appellees' counsel to argue that there was a plot or scheme relating to FMC's alleged promotion of off-label use of Fury in Arkansas and Mississippi. According to FMC, the court's ruling violated its due process rights under both the United States Constitution and the Arkansas Constitution because it allowed the jury to consider its out-of-state conduct during the trial on the merits and in determining punitive damages.

Appellees counter that there is no merit to FMC's argument on this point. According to Appellees, FMC itself introduced evidence concerning off-label application of Fury in Mississippi. Thus, Appellees contend that FMC cannot invite error and then complain about it on appeal. Moreover, Appellees argue that the off-label application of Fury in Arkansas and Mississippi were so intertwined that they could not be separated at trial.

In reviewing this allegation of error, we should begin with Appellees' assertion that FMC invited any error by introducing evidence of actions in Mississippi itself. Appellees point to the fact that FMC introduced as an exhibit at trial the "Mississippi and Arkansas FURY Wheat Agreement." FMC counters that it only introduced that document after the trial court denied its motion. The record reflects that FMC's pretrial motion specifically objected to the admission of any evidence related to the use of Fury in Mississippi. Prior to trial, a hearing was held on the motion, and the trial court denied the motion. Thus, we disagree with Appellees' assertion that the doctrine of invited error is applicable.

Turning now to the merits of this argument, FMC argues that its constitutional rights were violated by introduction of the Mississippi evidence during the trial on the merits, and because the trial court failed to bifurcate the punitive-damages proceedings, the Mississippi evidence could have been considered by the jury in awarding damages. In support of its argument, FMC points to two United States Supreme Court cases, *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996); and *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003). In both those cases, the Court held that a jury may not consider activity by a defendant that occurred in another state when assessing an award of punitive damages.

Notably, in *Campbell*, the Court recognized that a Utah trial court erred in approving a jury award, where it was, at least in part, based on evidence of State Farm's nationwide practices. In so ruling, the Court stated:

> This case, instead, was used as a platform to expose, and punish, the perceived deficiencies of State Farm's operations throughout the country. The Utah Supreme Court's opinion makes explicit that State Farm was being condemned for its nationwide policies rather than for the conduct directed toward the Campbells.

583 U.S. at 420.

In reviewing this case, it appears that Appellees attempted to use the Mississippi evidence in order to show a pattern or scheme on the part of FMC. In fact, the following statements were made by Appellees' counsel during opening statements:

> But the fact of the matter is there were over seventy-five farmers, at least seventy-five farmers in Arkansas and Mississippi, that had Fury sprayed on their wheat crop. There was over 1.4 million bushels of wheat that got sprayed with Fury. There was over 25,000 acres that got sprayed with Fury. They'll tell you this was just a simple miscommunication between these two people that got Fury sprayed on Mr. Helton and Mr. Clifton's farm but the fact of the matter is, folks, you will see plenty of evidence to tell you that maybe this wasn't just a miscommunication between two people over the telephone. So what happens? Fury has been unlawfully applied to these thousands of acres of wheat throughout Arkansas and Mississippi.
>
> . . . .
>
> There's no dispute on any of those matters but they are going to contend that these folks bear all the responsibility and it's not their

fault that this product got put on their wheat even though they sprayed it all across Mississippi and Arkansas.

And, again during closing arguments, reference was made to Mississippi:

Ladies and gentlemen, ask yourselves, and you will recall the testimony and I wrote a lot of it down, 75 farmers, two states, 24,000 acres, 1.5 million bushels of wheat.

■ We simply cannot determine whether the Mississippi evidence and the arguments of counsel impacted the jury's award of punitive damages in this case. It is certainly possible that the jury sought to impermissibly punish FMC for its actions in a state other than Arkansas. Thus, FMC's due process rights were violated in the instant case by the introduction of the evidence regarding the use of Fury in Mississippi. As the Supreme Court in *Gore*, 517 U.S. 559, 585, stated, "[w]hile each State has ample power to protect its consumers, none may use the punitive damages deterrent as a means of imposing its regulatory policies on the entire Nation."

Therefore, on remand, any evidence regarding any events related to the use of Fury in Mississippi may not be introduced into evidence.

### III. Evidence of Tax Returns

Another evidentiary matter to be considered is Agro's argument that it was error for the trial court to refuse to allow counsel to cross-examine Appellee Joyce Clifton with respect to various matters contained in her income tax statements. Appellees argue that there was no abuse of discretion on the part of the trial court in this regard. We agree with Appellees.

According to Agro, Clifton testified that not having access to funds generated from the sale of their wheat caused an economic hardship that resulted in emotional distress. In response to this testimony, counsel for Agro sought to cross-examine Clifton about various losses reported on her income tax statements. The trial court limited any such questions to the last three years of tax returns leading up to the 2001 Fury incident. Agro wanted to go back to Clifton's 1997 tax return, and the trial court refused to allow them to do so. Specifically, Agro wanted to show that there had been other times when Clifton had been faced with economic losses and wanted to compare those past losses to the emotional distress she now claimed.

The standard of review on admission of evidence is abuse of discretion. *Williams v. State*, 347 Ark. 728, 67 S.W.3d 548 (2002). This court has stated that abuse of discretion is a high threshold that does not simply require error in the trial court's decision, but requires that the trial court act improvidently, thoughtlessly, or without due consideration. *Nazarenko v. CTI Trucking Co., Inc.*, 313 Ark. 570, 856 S.W.2d 869 (1993).

Remaining mindful of this standard, this court cannot state the trial court abused its discretion with regard to Agro's cross-examination. The trial court allowed such examination, but limited it to tax issues that had occurred within a period of three years. Such a limitation seems reasonable and, thus, there was no abuse of discretion. Accordingly, Agro's argument on this point is without merit.

### IV. Motion in Limine

Next, Agro argues that the trial court erred in denying its fourth motion in limine regarding the admission of any evidence related to the outrage claim against it and Land O'Lakes. It seems that in this argument, Agro is asserting that Appellees were not entitled to amend their pleadings. In support of its novel agreement, Agro points to this court's decision in *Dumas v. Crowder*, 178 Ark. 143, 10 S.W.2d 43 (1928), for the proposition that pleadings cannot be amended once they have been challenged in the trial court. We agree with Appellees that this case is unavailing, as it predates our rules of civil procedure, including those governing the amendment of pleadings. Accordingly, Agro's argument on this point fails.

### V. Proffered Jury Instructions

Agro also argues that it was error for the trial court to refuse two of its proffered jury instructions. Specifically, Agro sought to submit a jury instruction on justifiable reliance and one on misrepresentation of law. Agro asserts that there was evidence supporting these instructions; thus, it was error for the trial court to refuse to instruct the jury. Agro concedes that the AMI instructions were correct recitations of the law, but argues that they were not thorough enough in explaining the law. Appellees counter that the proffered instructions did not thoroughly explain the applicable law to the jury.

It is well settled that this court will not reverse a trial court's refusal to give a proffered jury instruction unless there was an abuse

of discretion. *Williams v. First Unum Life Ins. Co.*, 358 Ark. 224, 188 S.W.3d 908 (2004). Moreover, this court has stated that it is not error for the trial court to refuse a proffered jury instruction, when the stated matter is correctly covered by other instructions. *Id.*

Here, Agro admits that the model instructions given to the jury correctly stated that law. Thus, the trial court did not abuse its discretion in refusing to submit Agro's proffered instructions to the jury.

## VI. Misrepresentation

It is unnecessary for us to fully discuss FMC's and Agro's arguments that the trial court erred in submitting Appellees' fraud claim to the jury. However, one of their underlying arguments is likely to be raised upon remand and, thus, for purposes of judicial efficiency, we will consider their argument that the misrepresentation at issue here is one of law, not fact. According to FMC and Agro, the misrepresentation, *i.e.*, that Fury could be used in a manner contrary to its labeling, is one of law because there is a statute in place governing the use of restricted-use pesticides. Therefore, they argue that Appellees cannot maintain a claim for fraud because Arkansas does not recognize a cause of action for misrepresentation of law.

In support of their argument, FMC and Agro rely on this court's decision in *Adkins v. Hoskins*, 176 Ark. 565 3 S.W.2d 322 (1928). That case is unavailing. *Adkins*, which stemmed from a divorce case, involved statements made by the appellee, who was a lawyer, to the appellant regarding certain elements of property division. As a result of the misleading statements made by the appellee, the appellant sought the recision of two executed contracts. This court rejected the appellant's argument, noting that the appellant's claims were that the appellee made misrepresentations of the law. This court stated:

> As a general rule, fraud cannot be predicated upon misrepresentations as to matters of law, nor upon opinions on questions of law based on facts known to both parties alike, nor upon representations as to what the law will not permit to be done, especially when the representations are made by the avowed agent of the adverse interest. Reasons given for this rule are that every one is presumed to know the law, both civil and criminal, and is bound to take notice of it, and hence has no right to rely on such representations or

> opinions, and will not be permitted to say that he was misled by them. Pursuant to this it has been held that fraud cannot be predicated on misrepresentations as to the legal effect of a written instrument, as, for example, a deed, or a Federal land warrant, or a contract of insurance.

*Id.* at 575, 3 S.W.2d at 326 (citation omitted).

■ The fact that there are statutes in place controlling restricted-use pesticides does not mean that the subsequent misrepresentation about the use of Fury was one of law. According to his testimony at trial, Teague represented that Fury could be used on Appellees' crops, but did not ascertain what type of crops were at issue. According to Teague, he assumed Davidson wanted a recommendation for a product that could be used on cotton. Davidson, who subsequently recommended Fury to Appellees for use on their wheat crops, admitted that he did not verify that Fury could now be used on wheat. There was simply no evidence that anyone ever made a representation that Fury could be used in a manner contrary to its label. In sum, the misrepresentation at issue in the present case is clearly one of fact, not law. Accordingly, FMC's and Agro's argument to the contrary is meritless.

## VII. Damages for Mental Anguish

Next, FMC and Agro argue that it was error to allow an award for mental anguish in the absence of an allegation of some type of physical injury. Appellees argue that the damages for mental anguish were permitted under the ADTPA. Specifically, Appellees argue that the ADTPA provides that an injured party is entitled to recover actual damages, and actual damages include damages for mental anguish.

In their complaint, Appellees specifically sought recovery for mental anguish under their claim for negligence. In addition, Appellees averred in their complaint that they were entitled to an award of actual damages under the ADTPA claim. Nothing in the record reveals under what theory the jury awarded damages for mental anguish, thus, we will analyze each possibility.

■ Appellees were not entitled to damages for mental anguish under a theory of negligence. This court has stated that Arkansas does not recognize negligent infliction of emotional distress. *See Mechanics Lumber Co. v. Smith*, 296 Ark. 285, 752

S.W.2d 763 (1988). Thus, Appellees' claim for negligence does not support an award for mental anguish. This court has also held that a claim for fraud will not support an award of damages for mental anguish. *Allen v. Allison*, 356 Ark. 403, 155 S.W.3d 682 (2004).

Thus, this court must determine whether Appellees' verdict under the ADTPA supports an award of damages for mental anguish. Civil enforcement and remedies for violations of the ADTPA are set forth in Ark. Code Ann. § 4-88-113 (Repl. 2001). Pursuant to subsection (f), "[a]ny person who suffers actual damage or injury as a result of an offense or violation as defined in this chapter has a cause of action to recover actual damages, if appropriate[.]"

As previously stated, Appellees claim that actual damages include damages for mental anguish. In support of their argument, Appellees rely on this court's decision in *United Ins. Co. v. Murphy*, 331 Ark. 364, 961 S.W.2d 752 (1998). According to Appellees, the *Murphy* case stands for the proposition that actual damages include damages for mental anguish or suffering. Moreover, Appellees argue that the *Murphy* decision was handed down one year prior to the General Assembly's amendment of the ADTPA to include recovery of actual damages; thus, the General Assembly is presumed to be familiar with our decisions and clearly intended to allow for the recovery of damages for mental anguish in ADTPA cases.

*Murphy*, however, is not a suit under the ADTPA; rather, it is a case involving allegations of defamation. In *Murphy*, the trial court instructed the jury with regard to presumed damages. In analyzing whether such an instruction was appropriate, this court quoted the United States Supreme Court's opinion in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350 (1974), for the proposition that where there is no malice, a party is limited to recovering damages for actual injury, which included "impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering."

There appears to be no Arkansas case specifically defining what constitutes actual damages. According to *Black's Law Dictionary* 35 (6th ed. 1990), "actual damages" is defined as "[c]ompensation for actual injuries or loss." The definition goes on to note that actual damages are synonymous with compensatory damages. Contrary to *Murphy*, this court has also indicated that damages for

mental anguish are separate from actual damages. *See Bank of Eureka Springs v. Evans*, 353 Ark. 438, 109 S.W.3d 672 (2003) (holding that compensatory damages were reasonable in light of award for actual damages, as well as an award for mental anguish).

While we recognize that there is a perceived inconsistency regarding what is included in "actual damages," we need not address that issue in the present case. Even if this court were to accept Appellees' argument that "actual damages" include damages for mental anguish, such a ruling would not obviate the requirement that Appellees prove that they suffered a physical injury that led to the mental anguish or that FMC or Agro wilfully or wantonly committed wrongs with the intention of causing mental distress.

A similar issue was addressed by this court in *M.B.M. Co., Inc. v. Counce*, 268 Ark. 269, 596 S.W.2d 681 (1980). In describing the case, this court stated:

> This is not a case in which there was injury resulting from a physical impact, so appellant's right to recover damages for emotional distress depends upon the existence of a cause of action to recover these damages when distress is not merely "parasitic" as an element of damages for physical injury.

*Id.* at 273, 596 S.W.2d at 684. The court then explained that there are some instances where a party could recover damages for mental anguish in the absence of a physical injury, stating:

> The rule is well settled in this state, but it has no application to willful and wanton wrongs and those committed with the intention of causing mental distress and injured feelings. Mental suffering forms the proper element of damages in actions for willful and wanton wrongs and those committed with the intention of causing mental distress.

*Id.* at 274, 596 S.W.2d at 684 (quoting *Wilson v. Wilkins*, 181 Ark. 137, 139, 25 S.W.2d 428, 428 (1930)).

The exception recognized by this court in *Counce*, however, is not applicable in the present case. Appellees are claiming that they are entitled to damages for mental anguish under the ADTPA, simply as a recovery for actual damages. However, they do not allege that FMC or Agro violated the provisions of that Act with the intent to cause them mental distress or that they suffered a physical injury.

Having determined that Appellees could not recover damages for their mental-anguish claim under the ADTPA, we will next address Appellees' allegation that the trial court erred in dismissing their claim for outrage, which would have also supported the award for mental damages.

Appellees have filed a conditional cross-appeal in this case. Appellees submit that if this court determines that their ADTPA claim does not support an award of damages for mental anguish, then this court should review the trial court's grant of a directed-verdict in favor of Agro and Land O'Lakes on their claim for outrage. In other words, Appellees argue that it was error for the court to dismiss their outrage claim because there was sufficient proof to support the elements and, thus, their outrage claim would support the award of damages for mental anguish. There is no merit to the conditional cross-appeal.

In determining whether a directed verdict should have been granted, we review the evidence in the light most favorable to the party against whom the verdict is sought and give it its highest probative value, taking into account all reasonable inferences deducible from it. *Curry v. Thornsberry*, 354 Ark. 631, 128 S.W.3d 438 (2003); *Woodall v. Chuck Dory Auto Sales, Inc.*, 347 Ark. 260, 61 S.W.3d 835 (2001); *Lytle v. Wal-Mart Stores, Inc.*, 309 Ark. 139, 827 S.W.2d 652 (1992). A motion for directed verdict should be granted only if there is no substantial evidence to support a jury verdict. *Woodall*, 347 Ark. 260, 61 S.W.3d 835; *Mankey v. Wal-Mart Stores, Inc.*, 314 Ark. 14, 858 S.W.2d 85 (1993). Stated another way, a motion for a directed verdict should be granted only when the evidence viewed is so insubstantial as to require the jury's verdict for the party to be set aside. *Conagra, Inc. v. Strother*, 340 Ark. 672, 13 S.W.3d 150 (2000). Where the evidence is such that fair-minded persons might reach different conclusions, then a jury question is presented, and the directed verdict should be reversed. *Howard v. Hicks*, 304 Ark. 112, 800 S.W.2d 706 (1990).

To establish an outrage claim, a plaintiff must demonstrate the following elements: (1) the actor intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of his or her conduct; (2) the conduct was extreme and outrageous, was beyond all possible bounds of decency, and was utterly intolerable in a civilized community; (3) the actions of the defendant were the cause of the plaintiff's distress; and (4) the

emotional distress sustained by the plaintiff was so severe that no reasonable person could be expected to endure it. *Allen*, 356 Ark. 403, 155 S.W.3d 682.

In *Crockett v. Essex*, 341 Ark. 558, 19 S.W.3d 585 (2000), this court stated:

> The type of conduct that meets the standard for outrage must be determined on a case-by-case basis. *Hollomon v. Keadle*, 326 Ark. 168, 931 S.W.2d 413 (1996). This court gives a narrow view to the tort of outrage, and requires clear-cut proof to establish the elements in outrage cases. *Croom v. Younts*, 323 Ark. 95, 913 S.W.2d 283 (1996). Merely describing the conduct as outrageous does not make it so. *Renfro v. Adkins,* 323 Ark. 288, 914 S.W.2d 306 (1996).

*Crockett*, 341 Ark. at 564, 19 S.W.3d at 589 (quoting *McQuay v. Guntharp*, 331 Ark. 466, 470-71, 963 S.W.2d 583, 585 (1998)). This court further elaborated in *Island v. Buena Vista Resort*, 352 Ark. 548, 103 S.W.3d 671 (2003), that liability for the tort of outrage has been found only in those cases where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

In this case, the trial court determined that Appellees had failed to submit proof that the conduct at issue rose to that level enunciated in *Island*. The trial court also focused on the fact that the emotional distress must be so severe that no reasonable person could be expected to endure it. We agree with the trial court that Appellees failed to submit sufficient proof to satisfy either of these prongs.

The record reflects that there was evidence presented that Kevin Conrad, the Land O'Lakes's employee, became embroiled in a dispute with Appellees. The dispute climaxed when Conrad threatened to remove Appellees' wheat from the Wilkisons' farm and dump it on the ground. Conrad testified that his actions with regard to the wheat were simply in response to the agreement with the Wilkisons that the wheat would be removed from their bins by August 1. Conrad explained that the Wilkisons needed their bins to store their own crops that were about to be harvested. Conrad further testified that he did not intend to inflict emotional distress on anyone and that he was just trying to help the farmers.

There was also an allegation that Appellees were injured by Agro cutting off their line of credit. The testimony of

Appellees indicated that prior to the Fury incident, both farmers were already on a cash basis with Agro. After the Fury incident, Agro allowed them to purchase some crop supplies on credit because it knew that their cash was tied up in the quarantined wheat. After Appellees failed to make any payments, though, the line of credit was revoked. Moreover, there was simply no evidence that J.R. Davidson or Doug Davidson recommended the use of Fury with the intent to inflict emotional distress or that they should have known that the recommendation would cause such distress. Nor was there any evidence that either of the Davidsons' conduct was so extreme or outrageous to rise to the level of outrage.

Finally, the testimony of Appellees failed to demonstrate that they suffered emotional distress so severe that no reasonable person could be expected to endure it. Roy Helton testified that as a result of his wheat being quarantined he was unable to sleep, lost weight, and had to start taking antidepressants. He also testified that the distress from this incident was as severe as that caused by losing his mother.

Ricky Clifton testified that he owned Clifton Farms with his mother, Joyce Clifton. He also reported problems sleeping and eating as a result of his wheat being quarantined. He stated that his wife had to take a second job and that his children were also affected by this incident. According to Clifton, the only time that he experienced worse mental distress was when his father passed away. Joyce also testified and stated that she was devastated when she was told that her wheat was being quarantined. She stated that she was nervous and could not sleep.

While Appellees testified about suffering sleep loss, loss of appetite, and anxiety, such distress is the type that reasonable people may be faced with throughout their lives. It does not satisfy the type of distress encompassed by a claim for outrage. Moreover, we agree with Agro's assertion that farmers are constantly faced with economic uncertainty. In fact, the Cliftons testified that they had declared Chapter 11 bankruptcy in March of 2001, well over a month before the Fury incident.

Accordingly, because all four elements of outrage could not be proven with sufficient evidence, the trial court correctly granted the motion for a directed verdict. Having determined that

Appellees' cross-appeal is without merit, we must conclude that there was no basis for Appellees' award of damages for mental anguish.

## VIII. Attorneys' Fees

Finally, we must address the issue of the award of attorneys' fees in this case. Both FMC and Agro argue that the trial court erred in its award of attorneys' fees in this case. First, FMC argues that Appellees are not entitled to an award of attorneys' fees at all. Alternatively, it argues that any such award should be limited to their portion of recovery under the ADTPA. Agro argues that the only way Appellees could recover attorneys' fees under the ADTPA was by making them a part of the cause of action as required under Ark. R. Civ. P. 54(b), and because they failed to do so, they have now waived their right to such fees. Appellees argue that there was no error as the ADTPA provides for the award of attorneys' fees.

First, we note that Agro's argument that Appellees waived their right to seek attorneys' fees by not pleading them as part of their cause of action under the ADTPA is without merit. Agro cites to no authority in support of this novel concept. This court has repeatedly held that we do not consider claims that are not supported by citation to authority. *See Johnson v. State*, 358 Ark. 460, 193 S.W.3d 260 (2004). Thus, we must now determine whether the trial court's award of attorneys' fees was reasonable. Notably, this court has not heretofore analyzed the reasonableness of fees in the context of an ADTPA case.

We have recognized generally, though, that a trial court is not required to award attorney's fees and, because of the trial judge's intimate acquaintance with the trial proceedings and the quality of service rendered by the prevailing party's counsel, appellate courts usually recognize the superior perspective of the trial judge in determining whether to award attorney's fees. *Jones v. Abraham*, 341 Ark. 66, 15 S.W.3d 310 (2000); *Chrisco v. Sun Indus., Inc.*, 304 Ark. 227, 800 S.W.2d 717 (1990). The decision to award attorney's fees and the amount to award are discretionary determinations that will be reversed only if the appellant can demonstrate that the trial court abused its discretion. *Nelson v. River Valley Bank & Trust*, 334 Ark. 172, 971 S.W.2d 777 (1998); *see also Chrisco*, 304 Ark. 227, 800 S.W.2d 717.

In *Chrisco*, this court set forth certain factors to be evaluated by a trial court when considering an award of attorney's fees. There, this court stated:

> Additionally, although there is no fixed formula in determining the computation of attorney's fees, the courts should be guided by recognized factors in making their decision, including the experience and ability of the attorney, the time and labor required to perform the legal service properly, the amount involved in the case and the results obtained, the novelty and difficulty of the issues involved, the fee customarily charged in the locality for similar legal services, whether the fee is fixed or contingent, the time limitations imposed upon the client or by the circumstances, and the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer. *State Farm Fire & Casualty Co. v. Stockton*, 295 Ark. 560, 750 S.W.2d 945 (1988); *Southall v. Farm Bureau Mut. Ins. Co. of Arkansas, Inc.*, 283 Ark. 335, 676 S.W.2d 228 (1984); *New Hampshire Ins. Co. v. Quilantan*, 269 Ark. 359, 601 S.W.2d 836 (1980).

*Id.* at 229-30, 800 S.W.2d at 718-19.

In this case, the trial court awarded Appellees attorneys' fees of $233,572.50. The trial court in its order followed the *Chrisco* factors in evaluating the reasonableness of the fee request and, ultimately, predicated its award on the provision of section 4-88-113(f), which provides for an award of fees in cases involving a violation of the ADTPA. The problem with the trial court's award is that it awarded Appellees the full amount of attorneys' fees that they sought in this case. The only basis for that award was the ADTPA claim, as attorneys' fees are not recoverable under the claims for fraud and negligence, the other claims on which Appellees prevailed. The trial court recognized in its order that there were no cases interpreting the attorneys' fee provision of section 4-88-113(f), but reasoned that a prevailing party need not prevail on all of its claims in order to be entitled to attorneys' fees. Thus, the trial court determined that Appellees, as the prevailing parties, were entitled to all of their fees, not just those connected with their ADTPA claim. This was an abuse of discretion.

In ruling as it did, the trial court relied on Ark. Code Ann. § 16-22-308 (Repl. 2001), which provides for the recovery of attorney's fees by the prevailing party in a contract action. Nothing in that statute, nor in section 4-88-113(f), provides that a party is

entitled to an award of all fees in cases where multiple claims have been pursued. In *Stein v. Lukas*, 308 Ark. 74, 823 S.W.2d 832 (1992), this court affirmed a trial court's denial of attorneys' fees under section 16-22-308, because the appellant's cause of action *primarily* sounded in tort. Moreover, in *Wheeler Motor Co., Inc. v. Roth*, 315 Ark. 318, 867 S.W.2d 446 (1993), this court held that attorneys' fees were not justified in a case prosecuted under multiple theories, where it appeared that the jury's verdict was predicated upon a theory sounding in tort. Finally, the court of appeals has addressed the issue of attorneys' fees in the context of suits involving multiple claims and held that:

> We do not disagree with the chancellor's finding that the appellees are the prevailing party. However, we do not think it is sufficient to base a fee award under § 16-22-308 upon a finding that a contract claim is a "substantial issue." Where both contract and tort claims are advanced, an award of attorney's fees to the prevailing party is proper only when the action is based primarily in contract.

*Meyer v. Riverdale Harbor Mun. Prop. Owners Imp. Dist. No. 1*, 58 Ark. App. 91, 93, 947 S.W.2d 20, 22 (1997).

Thus, under the above-stated line of cases, the trial court abused its discretion in awarding Appellees' all of their requested attorneys' fees, where only one of their causes of actions, namely the ADTPA claim, provided for such an award. Accordingly, the order awarding attorneys' fees is reversed.

Reversed and remanded.

IMBER, J., concurs.

ANNABELLE CLINTON IMBER, Justice, concurring. In reversing the trial court's award of attorney's fees, the majority states, "[T]he trial court abused its discretion in awarding Appellees their requested attorneys' fees, where only one of their causes of actions, namely the ADTPA claim, provided for such an award." In support of this result, the majority cites *Stein v. Lukas*, 308 Ark. 74, 823 S.W.2d 832 (1992), *Wheeler Motor Co., Inc. v. Roth*, 315 Ark. 318, 867 S.W.2d 446 (1993), and *Meyer v. Riverdale Harbor Mun. Prop. Owners Imp. Dist. No. 1*, 58 Ark. App. 91, 947 S.W.2d 20 (1997). In my opinion, these cases do not mandate reversal of the trial court's award of attorney's fees; rather, the award of attorney's fees must be set aside as premature in view of the fact that this case is being remanded for a new trial. Thus, I concur with that part of the opinion.

In each of the above cases, the request for attorney's fees was based on Ark. Code Ann. § 16-22-308, which allows for the recovery of attorney's fees by the prevailing party in disputes of a contractual nature. In each case, the court reasoned that fees were not appropriate where the cause of action primarily sounded in tort. *Stein v. Lukas, supra; Wheeler Motor Co., Inc. v. Roth, supra; Meyer v. Riverdale Harbor Mun. Prop. Owners Imp. Dist. No. 1, supra.* Here, it seems the majority contends that attorney's fees are not proper because the appellees' claims sounded primarily in causes of action other than the ADTPA, namely fraud and negligence. Yet, because Ark. Code Ann. § 4-88-107(a)(1) (Supp. 2003) incorporates an element of knowing misrepresentation into its definition, ADTPA claims brought under this section will inherently involve substantial questions of fraud or misrepresentation. Thus, despite the fact that the present case sounds primarily in misrepresentation and fraud, an award of attorney's fees would still be proper pursuant to Ark. Code Ann § 4-88-113(f) (Repl. 2001).

The unique nature of an ADTPA claim brought under Ark. Code Ann. § 4-88-107(a)(1) mandates that all such claims will primarily sound in fraud or negligence. According to this section, trade practices prohibited by the act include:

> Knowingly making a false representation as to the characteristics, ingredients, uses, benefits, alterations, source, sponsorship, approval, or certification of goods or services, or as to whether goods are original or new, or of a particular standard, quality, grade, style, or model.

Ark. Code Ann. § 4-88-107(a)(1). Based on this language, any plaintiff attempting to establish a violation of the ADTPA will likely also be establishing a case for fraud. This close interrelation is not present with contract and tort claims. While it is entirely possible that a claim would be based in contract and have little or no relation to a tort claim, ADTPA claims under section 4-88-107(a)(1) will, by their very nature, be substantially based in claims of misrepresentation or fraud. Though it is true that attorney's fees are generally not allowed in a traditional tort case, the legislature has chosen to make such fees available where a fraud or misrepresentation is perpetrated on a consumer. *See* Ark. Code Ann. §§ 4-88-107(a)(1), 113(f). To disallow attorney's fees in these cases simply because the claim sounds primarily in fraud or misrepresentation is in direct conflict with the clear legislative intent of this statute. Additionally, other jurisdictions

have allowed for the recovery of attorney's fees in cases involving fraud or misrepresentation where such fees are authorized by a consumer protection statute. *Miles Rich Chrysler-Plymouth, Inc. et al v. Mass.*, 201 Ga.App. 693, 411 S.E.2d 901 (1991); *McRae v. Bolstad*, 32 Wash.App 173, 646 P.2d 771 (1982); *Barnhouse Motors, Inc. v. Godfrey*, 577 S.W.2d 378 (Tex. Civ. App. 1979). Where, as here, the legislature has expressed a clear intent to overrule our common law precedent and allow attorney's fees in cases of consumer fraud or misrepresentation, I would not reverse the trial court's grant of attorney's fees for the reasons set forth in the majority opinion.