Wanda KIERSEY  *v.*  Beverly JEFFREY and Jim Jeffrey, Individually, and Hubbard Kiersey through Beverly Jeffrey, His Next Friend

06-1054                                            253 S.W.3d 438

Supreme Court of Arkansas
Opinion delivered March 15, 2007

[Rehearing denied April 26, 2007.*]

*Jones, Jackson & Moll, PLC,* by: *Jay Kutchka* and *Kimberly J. Frazier,* for appellant.

*Walters, Hamby & Gaston,* by: *Michael Hamby,* for appellees.

TOM GLAZE, Justice. Appellant Wanda Kiersey appeals from a jury verdict finding her liable to appellees Beverly Jeffrey and Hubbard Kiersey for the tort of outrage.[1] The jury awarded

---

* DANIELSON, J., not participating.

[1] This appeal was assumed by the supreme court on November 15, 1006, in order to balance the appellate caseload. *See* Ark. Sup. Ct. R. 1-2(g). The appeal, which involves an outrage claim and the compensatory and punitive damages awarded therefor, itself presents no issues of jurisdictional significance.

Beverly $1700 in compensatory damages and $500,000 in punitive damages; Hubbard received $25,000 in compensatory damages and $100,000 in punitive damages. On appeal, Wanda challenges both the jury's determination that she committed the tort of outrage and the amount of damages awarded.

Wanda is Hubbard's paternal grandmother; Beverly and Jim Jeffrey are Hubbard's mother and stepfather. Beverly was involved in a custody dispute over Hubbard with her ex-husband, Kenneth Kiersey, who had moved to Florida. At a custody hearing on September 26, 2002, a Sebastian County Circuit Court placed primary custody of Hubbard with Beverly.

On October 8, 2006, Wanda picked Hubbard up after school and drove him to the home of Jack and Reba Baggett. Once there, Hubbard called his father and told him that he was at the Baggetts' and that he would "hopefully . . . get to Florida soon." Hubbard also called his mother and told her that he was with friends and was okay. Hubbard stayed with the Baggetts for several days, until after Wanda was put in jail on contempt charges. Jack Baggett then took Hubbard home to his mother, Beverly, and stepfather, Jim.

On July 22, 2004, Beverly, Jim, and Hubbard filed suit against Wanda Kiersey and Jack Baggett, alleging the torts of outrage and false imprisonment. After Wanda's motion for summary judgment was denied, the case proceeded to a jury trial. As noted above, the jury found Wanda liable for outrage and awarded compensatory and punitive damages to Beverly and Hubbard. Wanda's posttrial motions for judgment notwithstanding the verdict and for remittitur were denied. Wanda filed a timely notice of appeal.

Wanda raises five points for reversal, but we find that her third argument is dispositive of the appeal. In that argument, she contends there was insufficient evidence to support the jury's verdict in favor of Beverly and Hubbard on their outrage claims. To determine whether substantial evidence exists to support a judgment in tort-of-outrage cases, this court will assess whether the evidence is substantial, and, in doing so, consider it in the light most favorable to the appellee. *See Travelers Ins. Co. v. Smith*, 338 Ark. 81, 991 S.W.2d 591 (1999); *Croom v. Younts*, 323 Ark. 95, 913

S.W.2d 283 (1996). Substantial evidence is evidence that is of sufficient certainty and precision to compel a conclusion one way or another, forcing or inducing the mind to pass beyond mere suspicion or conjecture. *Smith, supra.* It is well established that in reviewing a motion for a directed verdict, the evidence must be examined most favorably to the party against whom the verdict is directed, including all reasonable inferences that could be drawn from the evidence, and if any substantial evidence exists tending to establish an issue of fact in favor of that party, it is error for the court to take the case from the jury. *Id.*

To establish a claim for outrage, a plaintiff must demonstrate the following elements: (1) the actor intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of his conduct; (2) the conduct was "extreme and outrageous," was "beyond all possible bounds of decency," and was "utterly intolerable in a civilized community"; (3) the actions of the defendant were the cause of the plaintiff's distress; and (4) the emotional distress sustained by the plaintiff was so severe that no reasonable person could be expected to endure it. *Crockett v. Essex*, 341 Ark. 558, 19 S.W.3d 585 (2000) (citing *Angle v. Alexander*, 328 Ark. 714, 945 S.W.2d 933 (1997)).

The type of conduct that meets the standard for outrage must be determined on a case-by-case basis. *Id.* This court gives a narrow view to the tort of outrage, and requires clear-cut proof to establish the elements in outrage cases. *Id.* Merely describing the conduct as outrageous does not make it so. *Id.* Clear-cut proof, however, does not mean proof greater than a preponderance of the evidence. *Id.* We have taken a strict approach in determining the validity of outrage claims, and recognized that "the tort of outrage should not and does not open the doors of the courts to every slight insult or indignity one must endure in life." *Id.* Given the narrow view that this court has given to the tort of outrage, we must, in considering whether evidence is sufficient in such cases, determine whether it is substantial in light of those standards. *See Travelers Ins. Co. v. Smith, supra; Croom v. Younts, supra.*

On appeal, Wanda focuses on the fourth element of outrage, contending that neither Beverly nor Hubbard suffered emotional distress that was "so severe that no reasonable person could be

expected to endure it."[2] In the case in which Arkansas first recognized the tort of outrage, *M.B.M. Co., Inc. v. Counce*, 268 Ark. 269, 596 S.W.2d 681 (1980), this court discussed what was meant or intended by "emotional distress" as follows:

> It is of little consequence that different terms are used in describing the element of compensable damages involved as mental suffering, mental anguish, emotional distress, etc. Professor Prosser sees the term mental anguish comprehensive enough to cover everything from nervous shock to emotional upset, and agrees that the words emotional distress may well be used. In his view they include all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, anger, embarrassment, chagrin, disappointment, worry and nausea. Prosser, *Insult & Outrage*, 66 Cal. L. Rev. 43 (1956). *See also*, Restatement, Torts 2d 22, § 46, Comment j. *The emotional distress for which damages may be sought must be so severe that no reasonable person could be expected to endure it.* It must be reasonable and justified under the circumstances. *Liability arises only when the distress is extreme.* Restatement, Torts 2d 78, § 46, Comment j.

*Counce*, 268 Ark. at 280, 596 S.W.2d at 687 (emphasis added).

Turning to Wanda's arguments, she first discusses Hubbard's lack of severe emotional distress. Hubbard testified at trial that, when Jack Baggett dropped him off at home, Hubbard was a "little bit" upset because he "wouldn't be able to get to Florida," but that he was "embarrassed about the whole thing." He stated that he did not go back to school for a few weeks afterward because he was "still nervous and . . . just felt out of place," and that, when he did go back to school, it was "kind of embarrassing talking to the other students because they all had questions to ask, and it was just hard." It was "probably a long time" before he felt "totally comfortable again," but the thing that bothered him was that it was "really embarrassing." Some of his grades dropped from an A to a B, and he had some trouble catching up with homework. However, Hubbard testified that he did not fear that a similar thing might happen again, and he stated that he did not fear his grandmother.

---

[2] Wanda also raises an argument contending that her actions were not the cause of any emotional distress suffered by Beverly or Hubbard. She states that Hubbard's distress was caused by concern over his father's health, and Beverly's distress was caused by Hubbard's failure to call her to tell her where he was. However, these claims overlook that the underlying factor in both outrage claims was Wanda's actions in removing Hubbard from his mother's home.

Regarding Hubbard's alleged distress, Beverly testified that, after he came home, he "was not comfortable about going to school, he was embarrassed." On the day he came back, he "wasn't talking very much." She also stated that he was quiet and did not want to talk about what had happened, and that he "wasn't as outgoing and gung-ho to do things." She noted that his grades had dropped from all A's to some B's, and Hubbard "never liked it if he didn't make A's, so that bothered him."

On cross-examination, Beverly agreed that Hubbard was a "well-rounded young man." She also stated that, after the events of October 2002, he continued to be active in the band at school and in his church activities. Beverly conceded that no doctor, including Hubbard's psychiatrist, Dr. Barling, whom Hubbard had been seeing since he was three years old, had ever told her that Hubbard suffered from any severe emotional distress; that Hubbard had never needed to take medication or see a psychiatrist; and that Hubbard had never been diagnosed with depression, anxiety, or "anything like that."

The evidence of Beverly's alleged emotional distress showed that she was understandably upset; she stated that she was "very upset, . . . crying, . . . [and] shaking all over" immediately after Hubbard disappeared. She further stated that she slept very little during the time when Hubbard was gone, and that one night, she "was having a hard time breathing, [she] was just getting really, really hot, and . . . was just so upset." She said that she couldn't eat, couldn't sleep, and was "just upset."

On cross-examination, Beverly stated that she had gone to see her regular physician after this was all over and told him that she was upset; he suggested that she "probably was depressed." Her doctor prescribed her sleeping pills, but she only took them periodically because she "wanted to try to use [her] faith to get [her] through that instead of depending on drugs." Beverly agreed that she had never gone to see a psychiatrist or psychologist about her depression or her inability to sleep or eat, and although she spoke to Dr. Barling when she took Hubbard to see him, she did not consider that a counseling session.

The testimony described above does not amount to "clear-cut proof" that the emotional distress for which damages were sought was "so severe that no reasonable person could be expected to endure it." *See, e.g., Island v. Buena Vista Resort*, 352 Ark. 548, 103 S.W.3d 671 (2003) (no outrage proven when the alleged

emotional distress of the plaintiff was not severe, where plaintiff did not allege any peculiar susceptibility to emotional distress on her part, and the effect on the plaintiff of the conduct complained of was inconsequential); *Givens v. Hixson*, 275 Ark. 370, 631 S.W.2d 263 (1982) (where plaintiff testified that, after he was fired, he "was depressed, could not sleep or eat, lost weight, and entered a hospital a month later (apparently owing to a heart condition)," this court held the evidence was insufficient to support an outrage claim).

In *FMC Corp. v. Helton*, 360 Ark. 465, 202 S.W.3d 490 (2005), this court held that an outrage claim was unsupportable, even where the plaintiff testified that, as a result of the defendant's conduct, he was unable to sleep, lost weight, and had to start taking antidepressants, and even described his distress as being "as severe as that caused by losing his mother." 360 Ark. at 486, 202 S.W.3d at 505. This court wrote further as follows:

> While appellees testified about suffering sleep loss, loss of appetite, and anxiety, such distress is the type that reasonable people may be faced with throughout their lives. It does not satisfy the type of distress encompassed by a claim for outrage.

*Id.*; *cf. Croom v. Younts, supra* (outrage verdict upheld where fifty-one-year-old man engaged in a sexual relationship with his fifteen-year-old cousin, and the girl was prescribed an antidepressant and later even attempted suicide when her mother confronted the older cousin about the relationship); *Growth Props. I v. Cannon*, 282 Ark. 472, 669 S.W.2d 447 (1984) (cemetery owner's actions in running heavy construction equipment over burial plots in such a way as to damage and expose burial vaults, including the vault belonging to plaintiffs' loved ones, caused "severe mental anguish and distress" to the plaintiffs).

In the instant case, there is no clear-cut proof of severe emotional distress. While Hubbard may have been embarrassed and briefly suffered a dip in his grades, nothing in the evidence presented to the jury supported a conclusion that he suffered emotional distress so severe that no reasonable person could be expected to endure it. Likewise, Beverly's testimony about her own state of mind was insufficient to warrant a finding that she suffered severe emotional distress. The evidence certainly showed that she was upset; however, she was not so upset as to seek medical or psychological treatment. Although Beverly's distress

was understandable, it was simply not so severe as to support the jury's verdict that Wanda should be held liable for outrage.

Because we conclude that the evidence fails to support the jury's verdict on the outrage claims, it is unnecessary to consider Wanda's arguments that the damages awarded were excessive and that the trial court erred in excluding certain proffered testimony.

Reversed and dismissed.

DANIELSON, J., not participating.